**Frank Andre WARE, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Nos. 93–1172–CIV–T–17C,
93–1173–CIV–T–17C.

United States District Court,
M.D. Florida,
Tampa Division.

July 21, 1997.

Mina Jane Morgan, Mitcham, Weed, Barbas, Allen & Morgan, Tampa, FL, Anthony P. Gauthier, Thomas Patrick Howard, Law, Weathers & Richardson, Grand Rapids, MI, for Frank Andre Ware.

Whitney L. Schmidt and Steven Nisbitt, Asst. U.S. Atty., U.S. Attorney's Office, Middle District of Florida, Tampa, FL, for U.S.

## MEMORANDUM OPINION

KOVACHEVICH, Chief Judge.

This civil action was tried before the Court, sitting without a jury, for approximately nine (9) days in October, 1996. The plaintiff, FRANK ANDRE WARE (hereinafter Ware), a former criminal defendant who was acquitted of federal drug charges, sued the defendant, UNITED STATES OF AMERICA (hereinafter the Government), for malicious continuation of prosecution under the Federal Tort Claims Act (hereinafter FTCA). As orally directed by the Court, the parties have submitted, in writing, their closing arguments,[1] proposed findings of fact and conclusions of law,[2] certain evidentiary objections,[3] and other unresolved matters,[4] including the Government's motion to dismiss for lack of subject matter jurisdiction [5] and all properly preserved motions and objections at

---

1. Plaintiff's at Docket No. 224; Defendant's at Docket No. 226.

2. None received from Plaintiff; Defendant's at Docket No. 227.

3. None received from Plaintiff; Defendant's at Docket No. 225.

4. (1) Defendant's Objections and Cross–Designations with Respect to Plaintiff's Designation of Deposition Testimony to be Offered from Clifford Hedges' Deposition at Docket No. 174; No specific response from Plaintiff.
(2) Defendant's Objection to Plaintiff's Proposed Itemization of Damages as Contained within Plaintiff's Amendment to Joint Pretrial Stipulation at Docket No. 180; No specific response from Plaintiff.

(3) Plaintiff's Motion in Limine at Docket Nos. 181–182; Defendant's Response at Docket No. 188.
(4) Defendant's Motion for Dismissal of Plaintiff's Claim and Judgment on Partial Findings Pursuant to Fed.R.Civ.P. 52(c) at Docket No. 196 & Memorandum of Law in Support of its Motion for a Judgment on the Case on Issue of Failure to Prove Lack of Probable Cause at Docket No. 197; Plaintiff's Responses at Docket No. 223.
(5) Defendant's Brief Concerning Objections to Deposition Transcripts Received in Evidence at Trial at Docket No. 225; No specific response from Plaintiff.

5. Defendant's motion at Docket No. 195; Ware's response at Docket No. 222.

trial. For the reasons expressed in this Order, the Court finds in favor of the Government.

### PROCEDURAL HISTORY

*I. Administrative Claims.*

1. On March 15,1991, Ware submitted two (2) administrative claims stemming from his criminal prosecution, one each to, respectively, the Federal Bureau of Investigations (hereinafter FBI) and the U.S. Attorney's Office located in Tampa, Florida. Both agencies denied the claims. Ware submitted two (2) more administrative claims on February 3 and June 13 of 1992, one each to, respectively, the U.S. Attorney in Tampa, Florida, and the FBI in Boston, Massachusetts. With regard to the June 13 administrative claim, *Plaintiff's Exhibit No. 5,* a three (3) page document, Ware complained that an FBI Agent, Clifford Hedges, "intentionally, purposefully, and vindictively withheld the [results of an FBI fingerprint test] ... for the express purpose of hindering and prejudicing [Ware's] defense...." Ware sought $50,000,000.00 in damages because "[t]he actions of Agent Cliff Hedges were the proximate [sic] cause of [Ware] being wrongfully convicted, and the proximate cause of [Ware] having to suffer false imprisonment, mental anguish, psychological trauma, and humiliating and degrading loss of reputation, and loss of life's pleasures." Ware did not specifically employ the phrase "malicious prosecution" or "malicious continuation of prosecution" in any of his administrative claims.[6] Both the February and June claims were denied by the receiving agency.

*II. Judicial Proceedings in Michigan.*

2. After his first two (2) administrative claims were denied, Ware commenced this action in the Western District of Michigan, Southern[7] Division, by filing a "Civil Rights Complaint with Jury Demand" on July 1, 1992. (Case No. 4:92–CV–98, Docket No. 1). Proceeding *pro se* and *in forma pauperis* (Docket No. 2), Ware sued: (1) the Attorney General of the United States (hereinafter AG), then William P. Barr, in his official capacity; (2) Assistant United States Attorney (hereinafter AUSA) Dennis Moore, in his official and individual capacities; (3) Special FBI Agent Cliff Hedges, in his official and individual capacities; and (4) Mr. George Pedrolini (hereinafter Pedrolini), Ware's criminal co-defendant, in his individual capacity. Ware alleged a variety of constitutional and statutory civil rights violations and sought at least fifty (50) million dollars ($50,000,000.00) in damages.[8]

3. Within five (5) months of filing his complaint, Ware retained trial counsel (Docket No. 10) and shortly thereafter voluntarily dismissed his claims, without prejudice, against AG Barr and AUSA Moore, in all listed capacities, and Agent Hedges, in only his official capacity (Docket No. 26). Thus, at this point in time, Case Number 4:92–CV–98 retained Ware's claims against Agent Hedges and Pedrolini in their individual capacities.

4. On March 12, 1993,[9] Ware commenced a new action, 4:93–CV–21, by filing an amended complaint with jury demand (Docket No. 34). In the amended complaint, which superseded the original complaint in 4:92–CV–98, Ware asserted claims against the Government, FBI Agent Hedges in his individual capacity, and Pedrolini. Unlike the original complaint, the amended complaint

---

6. The Court will address the significance of this omission *infra.*

7. This document was actually styled as being filed in the Kalamazoo Division. This was erroneous; the proper name for this division of the Western District of Michigan is the Southern Division. 28 U.S.C. § 102.

8. Specifically, Ware asked for: (1) $30,000,000.00 in compensatory damages from each of the defendants AG Barr, AUSA Moore, and FBI Agent Hedges in their official capacities; (2) $50,000,000.00 in punitive damages from each of the above defendants; (3) $5,000,000.00 in various damages from each of the defendants, presumably in all listed capacities; (4) $5,000,000.00 in various damages from AUSA Moore and Agent Hedges, presumably in all listed capacities; and (5) $10,000,000.00 in various damages from each of the defendants.

9. Ware's February and June (1992) administrative claims had been denied at this point.

contained separate and distinct counts: (1) negligence, defamation, malicious continuation of prosecution, and false imprisonment against the Government pursuant to the FTCA, Count I; (2) conspiracy to deprive Ware of certain constitutional rights against Agent Hedges and Pedrolini pursuant to 42 U.S.C. § 1985(3), Count II; and (3) constitutional violations committed under color of federal authority against Agent Hedges pursuant to *Bivens v. 6 Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), Count III. By court order, Pedrolini was dismissed without prejudice from both civil actions because of Ware's failure to timely serve him. (Docket No. 41).

5. Once his cases were consolidated in Michigan, Ware sought a jury trial for Counts II and III against Agent Hedges and a bench trial for Count I against the Government.[10] However, in July 1993, Ware's case moved from Michigan to Florida. As to Counts II and III, the Honorable Richard A. Enslen, U.S. District Judge, granted Agent Hedges' motion to dismiss for improper venue because, under 28 U.S.C. § 1391(b)(2), there was no substantial relationship between plaintiff's claims and the Western District of Michigan. As to Count I, Judge Enslen granted the Government's motion under 28 U.S.C. § 1404(a) and transferred Ware's consolidated civil actions to the Middle District of Florida, Tampa Division. (Docket Nos. 60–61).

*III. Judicial Proceedings before this Court.*

6. Upon receiving what was left of Ware's consolidated cases from Michigan, the Clerk of this Court issued them two (2) consecutive case numbers, 93–1172–CIV–T–17C and 93–1173–CIV–T–17C. However, because one (1)

amended complaint controlled both cases, this Court ordered that they be consolidated into the lower case number. (Docket No. 63).

7. Substantively, this Court narrowed Ware's six (6) causes of action within Count I down to two (2). First, at the motion to dismiss stage, the Court dismissed Ware's negligence and defamation claims within Count I.[11] *Ware v. United States*, 838 F.Supp. 1561 (M.D.Fla.1993) (Docket No. 89). The Court held, *inter alia*, that it had no subject matter jurisdiction over the negligence claim because Ware failed to exhaust his administrative remedies. The Court reasoned that Ware failed to allege negligence in his administrative claim.

8. Although the Court granted the Government's motion to dismiss Ware's negligence and defamation claims, it denied the motion as to Ware's malicious continuation of prosecution and false imprisonment claims. However, the Court held that Ware could only rely upon the acts or omissions of Agent Hedges, not AUSA Moore, in his FTCA claim against the Government.

9. The Government did not argue that Ware failed to exhaust his administrative remedies with regard to any other claim within Count I, including malicious continuation of prosecution. Rather, it pursued this exhaustion argument only with regard to negligence. (Docket No. 79, p.17 n. 8). In fact, the Government filed a twelve (12) page motion to reconsider the Court's denial of the Government's motion to dismiss Ware's malicious continuation of prosecution and false imprisonment claims. (Docket No. 92). Again, the Government advanced no exhaustion argument, and the Court denied the motion for reconsideration on substantive grounds.[12] *Ware v. United States*, 1994 WL

---

**10.** Ware is not entitled to a jury trial for his action against the Government, in that a jury trial is beyond the scope of the Government's statutory waiver of sovereign immunity. 28 U.S.C. § 2402.

**11.** At this point in time, Count I was the only surviving count in Ware's amended complaint

because of Judge Enslen's order of dismissal as to Counts II and III.

**12.** Contending that the Government brought this motion for reconsideration for an improper purpose, Ware moved for sanctions under Fed. R.Civ.P. 11; the motion was denied. *Ware v.*

34173 (M.D.Fla. Feb. 2, 1994) (Docket No. 99).

10. Counts II and III of Ware's amended complaint—dismissed for improper venue by Judge Enslen—were revived by this Court when it granted Ware's motion to amend his amended complaint. *Ware v. United States,* 152 F.R.D. 225 (M.D.Fla.1993) (Docket No. 88). Accordingly, Ware filed a second, and final, amended complaint on December 3, 1993 (Docket No. 94), which both the Government (Docket No. 106) and Agent Hedges (Docket No. 137) answered.

11. These counts, however, did not survive for long. This Court granted Agent Hedges' motion to dismiss Count II for failure to state a claim under 42 U.S.C. § 1985(3). *Ware v. Barr, United States Attorney General,* 883 F.Supp. 654 (M.D.Fla. 1995) (Docket No. 152). With regard to Count III, the *Bivens* action against Agent Hedges in his individual capacity, this Court declined to grant Agent Hedges qualified immunity due to the unresolved issues of fact.[13]

12. Agent Hedges took an interlocutory appeal of this ruling to the United States Court of Appeals for the Eleventh Circuit. In a per curiam unpublished opinion, the circuit court reversed this Court's ruling on the qualified immunity issue and directed it to enter judgment in favor of Agent Hedges. (Docket No. 160). The circuit court held that "the relevant case law did not clearly establish that the negative fingerprint crime-lab report constituted *Brady* material in the circumstances of this case." As such, Agent Hedges was no longer a party to this action.

13. The only remaining portion of Ware's second amended complaint (Docket No. 94) for trial was Count I against the Government. Although Ware could have tried both his malicious continuation of prosecution and false imprisonment claims, he chose to pursue only the former and surrendered the latter. (Docket No. 183).

*United States,* 154 F.R.D. 291 (M.D.Fla.1994) (Docket No. 120).

### FINDINGS OF FACT

The Court has duly reviewed and considered: (1) the undisputed portions of the pleadings and documents; (2) the testimony of the witnesses and their credibility; (3) the trial exhibits; and (4) the oral and written arguments of counsel. In accordance with Fed.R.Civ.P. 52(a), the Court, sitting as the trier of fact, renders the following findings of fact and conclusions of law. To the extent that any finding of fact actually constitutes a conclusion of law, it is adopted as such. The converse also applies to the extent that any conclusion of law actually constitutes a finding of fact.

### I. Persons Involved.

1. Plaintiff FRANK ANDRE WARE is an individual presently residing in New York, New York. *Ware's Testimony; Defendant's Exhibit No. 49 (Answer to Interrogatory No. 2 ).* At all relevant times, Ware was a resident of Kalamazoo, Michigan. *Amended Complaint (Docket No. 94) at ¶ 4; Ware's Testimony.*

2. Clifford Hedges is a Special Agent of the FBI formerly assigned to the Tampa, Florida, field office and presently assigned to the Boston, Massachusetts, field office. *Amended Complaint at ¶ 6; Answer (Docket No. 106) at ¶ 6.* The FBI is an agency within the Executive Branch of the Defendant, UNITED STATES OF AMERICA, specifically, the Department of Justice. *Fed. R.Evid.* 201(b)–(c) (judicial notice of a fact not subject to dispute). Agent Hedges was the lead law enforcement agent involved in the investigation and prosecution of Ware and Pedrolini. *Plaintiff's Exhibit No. 7 (deposition testimony of Agent Hedges); Nelson's Testimony.* Agent Hedges sat at counsel table during both of Ware's criminal trials. *Id.*

3. Dennis Moore is an Assistant United States Attorney who served as the lead pros-

13. Although he moved to dismiss Count II, Agent Hedges moved for summary judgment with regard to Count III.

ecutor in both of Ware's criminal trials. *Ware's Testimony; Plaintiff's Exhibit No. 7 (deposition testimony of Agent Hedges).* There was no testimony, live or otherwise, from AUSA Moore in this civil action.

4. Greg Miller is an Assistant United States Attorney who sought court approval to wiretap confidential informant Marlon Von Reese's phone line in 1989. *Miller's Testimony.* At the civil bench trial, it was remembered, for the first time, that the undersigned was the judicial officer who approved the wiretap. *Id.* The Court having disclosed this information immediately upon recollection, the parties expressed no objection to the undersigned's further involvement with the civil case. *Id.*

5. Walter "Terry" Furr is an Assistant United States Attorney who made the decision, with supervisory approval, to charge Ware and Pedrolini and present the case to a federal grand jury. *Furr's Testimony.* That was the extent of AUSA Furr's involvement with the criminal action. *Id.* At the civil trial, there was no testimony proffered about the evidence presented to the grand jury. Nor was there testimony from any of the grand jurors.

6. FBI Agent Glen Edwards, DEA Agents Michael Powers and Roger Vernoy, and Pasco County Deputy Sheriffs John Nelson, Robert Sullivan, and Paul Umbaugh, III, were law enforcement officers involved with the April, 1989, incident by way of a multi-jurisdictional task force. *Edwards', Vernoy's, Powers', Nelson's, Sullivan's, and Umbaugh's Testimony.* Agent Vernoy served as an undercover agent. *Vernoy's Testimony.* Posing a the cocaine seller, Agent Vernoy exchanged four (4) kilograms of cocaine for $54,980.00 in cash, as delivered by Pedrolini. *Id.*

7. George Joseph Pedrolini is an individual residing in Kalamazoo, Michigan. *Defendant's Exhibit Nos. 5 & 5A (deposition testimony of Pedrolini).* He was the co-defendant to Ware in *United States of America v. George Pedrolini and Frank Ware, a/k/a George Pedrocini,* Case No. 89–92–Cr–

T–15A. Having pled guilty with the benefit of a plea agreement, Pedrolini testified against Ware at both criminal trials. *Defendant's Exhibit Nos. 5 & 5A.* Pedrolini's testimony was dispositive of Ware's criminal liability; without it, the Government could not have established a *prima facie* case for the offenses charged. *Plaintiff's Exhibit No. 7 (deposition testimony of Agent Hedges); Defendant's Exhibit No. 57 (U.S. District Judge Merryday denying Ware's motion for judgment of acquittal at the close of the Government's case at the second criminal trial, relying on Pedrolini's testimony).*

8. Marlon Von Reese is a resident of New Port Richey, Pasco County, Florida. *Von Reese's Testimony.* Von Reese and Pedrolini had engaged in approximately five (5) or six (6) unlawful drug deals prior to April, 1989. *Id.* Von Reese served as a confidential informant to federal, state, and local law enforcement with regard to the April, 1989, incident with Pedrolini and Ware. *Id.* Von Reese served as the middleman; he brought Pedrolini to the (undercover) cocaine seller. *Id.* Von Reese never met Ware prior to his arrest. *Id.*

9. Brenda Burgheis was an acquaintance of Pedrolini and Ware. She testified for Ware at the second criminal trial. *Plaintiff's Exhibit No. 13.*

## II. Events Prior to Florida.

10. In the early part of 1988, Burgheis introduced Ware to Pedrolini. *Ware's Testimony; Plaintiff's Exhibit No. 13 (second criminal trial testimony of Burgheis); Defendant's Exhibit Nos. 5 & 5A (deposition testimony of Pedrolini).* Burgheis wanted Pedrolini to meet Ware because Ware was known as a substantial drug dealer in Kalamazoo, Michigan. *Defendant's Exhibit Nos. 5 & 5A.* At trial, there was a dispute as to whether Pedrolini and Ware had met one another while employees at General Motors. *Compare Ware's Testimony (first met Pedrolini at GM) with Defendant's Exhibit Nos. 5 & 5A (first met Ware with Burgheis).* In any event, at Burgheis' "introduction," Ware

agreed to pay Pedrolini $4,200.00 for six (6) ounces of cocaine. *Defendant's Exhibit Nos. 5 & 5A.* Pedrolini subsequently obtained this cocaine from his supplier, Von Reese, and tendered it to Ware. *Id.* Ware later delivered the cash to Pedrolini. *Id.*[14]

11. As stated *supra*, Von Reese and Pedrolini had engaged in approximately five (5) or six (6) drug deals prior to April, 1989. In one instance, Pedrolini delivered one (1) kilogram of cocaine to a buyer as a middleman for Von Reese. *Defendant's Exhibit Nos. 5 & 5A; Von Reese's Testimony.*

12. After Von Reese moved to Florida, Pedrolini and Burgheis drove to and stayed at Von Reese's home. *Defendant's Exhibit Nos. 5 & 5A (deposition testimony of Pedrolini); Plaintiff's Exhibit No. 13 (second criminal trial testimony of Brenda Burgheis).* No drugs were purchased or otherwise exchanged. *Id.* Pedrolini did not have enough cash to purchase cocaine and Von Reese apparently expressed reservations about Burgheis' trustworthiness in light of her prostitution. *Defendant's Exhibit Nos. 5 & 5A.*

13. Just prior to April, 1989, Ware and Burgheis went to Chicago, Illinois, for the purpose of purchasing cocaine for resale. *Defendant's Exhibit Nos. 5 & 5A (deposition testimony of Pedrolini).* They were unsuccessful. *Id.*

**EVIDENTIARY RULING:** As the parties will recall, the Court **OVERRULED** Ware's objections to those portions of Pedrolini's deposition that contain out-of-court statements by Burgheis (p.23, lines 8–17; p.24, lines 19–22; p.26, lines 5–16; p.72, lines 20–24). The Court admitted this evidence under Fed.R.Evid. 801(d)(2)(E), finding that there was a conspiracy involving Burgheis, Pedrolini, and Ware and that the statements were made in the course and furtherance of said conspiracy. It is important to note that both declarants—Burgheis and Pedrolini—are unavailable and there is no dispute that Pedrolini's deposition testimony is admissible under Fed.R.Evid. 804(b)(1).

With regard to the conspiracy, the Court examined both the hearsay statement and independent evidence, *Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). Ware himself admitted that he, Burgheis, and Pedrolini had met together. Pedrolini's deposition testimony, both challenged and unchallenged portions, corroborates the group's agreement to purchase cocaine for resale. Further, Dirk Bartley testified that Burgheis obtained cocaine from Ware for resale and personal use.

These out-of-court statements were also made during and in furtherance of the conspiracy. All statements by Burgheis occurred before Ware's arrest and related to obtaining cocaine for resale and other unlawful use.

The Court also notes that, with regard to p.72, lines 20–24, Ware has waived his right to object to that testimony because, under Fed.R.Civ.P. 32(d)(3)(B), Pedrolini's alleged non-responsive answer to plaintiff counsel's question "might [have been] obviated ... or cured" if objected to at the deposition. No such objection was seasonably raised by Ware.

It should also be mentioned that Ware's prior bad acts, such as his prior cocaine purchases from Pedrolini and his Chicago trip with Burgheis, are not admissible to prove that Ware acted in conformity with his character in April, 1989. Fed.R.Evid. 404(b).

14. In the months preceding April, 1989, Von Reese had continually offered to sell cocaine to Pedrolini if he came to Florida. *Defendant's Exhibit Nos. 5 & 5A (deposition testimony of Pedrolini).* Unbeknownst to Pedrolini, Von Reese had become a confidential informant at the time of these telephone calls. *Id.; Von Reese's Testimony.* This "sting" was planned by FBI Agent Hedges in Tampa with cooperation from state and local

---

**14.** Von Reese lived in Kalamazoo, Michigan, at this time.

authorities. *Plaintiff's Exhibit No. 7 (deposition testimony of Agent Hedges).*

15. Upon hearing of Burgheis' and Ware's unsuccessful trip to Chicago, Pedrolini told Ware that he could obtain cocaine from Von Reese at $19,000.00 to $19,500.00 per ounce. *Defendant's Exhibit Nos. 5 & 5A (deposition testimony of Pedrolini).*

16. Ware agreed to supply $58,000.00 in cash for the cocaine. *Defendant's Exhibit Nos. 5 & 5A (deposition testimony of Pedrolini).* Pedrolini would drive to Florida with Ware in Pedrolini's car and arrange for and actually purchase the cocaine from Von Reese. *Id.* In return, Ware promised to pay Pedrolini $2,000.00 in cash and to satisfy Ware's $3,000.00 outstanding debt to Pedrolini. *Id.*

17. After reaching this agreement, Ware told Dirk Bartley, an acquaintance of Ware's in Kalamazoo, that he was planning to take a trip to Florida. *Dirk Bartley's Testimony.* Bartley understood that upon Ware's return, Ware would have cocaine for resale in Kalamazoo, which was experiencing a "dry spell" of cocaine supply. *Id.*

*EVIDENTIARY RULING:* Dirk Bartley's testimony was unknown to Agent Hedges and the Government prior to and during Ware's criminal prosecution. It is, therefore, not relevant to any of the essential elements of malicious prosecution. However, it is relevant to the Government's affirmative defense of guilt-in-fact. Specifically, Dirk Bartley's testimony is circumstantial evidence of Ware's unlawful agreement with Pedrolini. Accordingly, Ware's motion in limine to exclude all offers of proof regarding evidence of Ware's guilt (Docket Nos. 181–182), on which the Court deferred ruling, be **GRANTED IN PART** as to the relevance of Dirk Bartley's testimony and other similar post-acquittal evidence-as the Court will note *supra* —to the

essential elements of the cause of action, and **DENIED IN PART** as to such evidence's relevance to the Government's affirmative defense of guilt-in-fact.[15] For more discussion of this ruling, see *infra* Conclusions of Law ¶ 102.

18. Ware told another Kalamazoo acquaintance, Bradley Fields, that he was going to Florida to purchase cocaine. *Bradley Fields' Testimony.* In fact, Ware "fronted" Fields two (2) ounces of cocaine and promised him more upon returning from Florida. *Id.*

*EVIDENTIARY RULING:* As with Dirk Bartley's testimony, Bradley Fields' testimony is inadmissible to show Ware's failure to prove the essential elements of malicious prosecution, in that neither Agent Hedges nor the Government knew of this witness until after Ware's acquittal. However, the testimony is admissible with regard to the Government's affirmative defense of guilt-in-fact. The Court reincorporates its ruling on Ware's motion in limine (Findings of Fact, ¶ 17).

19. On April 20, 1989, Von Reese telephoned Pedrolini at Pedrolini's home about where they would meet in Florida. *Defendant's Exhibit Nos. 21A & B.*[16] No reference was made to a third party such as Ware. *Id.*

20. Within minutes, Pedrolini returned Von Reese's phone call as agreed. *Defendant's Exhibit Nos. 21A & C.* Pedrolini was concerned about wiretaps on his home telephone, so he returned Von Reese's phone call from a pay phone. *Von Reese's Testimony.* While discussing where to meet, Pedrolini told Von Reese that "there's one guy that's gotta come with me, and I don't want him to see you or you see him, you know what I'm saying." *Defendant's Exhibit Nos. 21A & C.* Asking who this "guy" was, Pedrolini responded that "he's straight as an arrow . . .

---

**15.** The Court previously **GRANTED** the first part of Ware's motion in limine (Docket No. 181), which sought to collaterally estop the Government from challenging the exculpatory/*Brady* nature of the fingerprint report. *See* Clerk's Minutes (Docket No. 191).

**16.** Von Reese's telephone lines were wiretapped by law enforcement, at the initiative of DEA Agent Powers and AUSA Miller, and approved by this Court. *See* Findings of Fact, ¶ 4.

[d]on't worry about it." *Id.* Von Reese expressed to Pedrolini that he did not want any contact with this "guy," and vice-versa. *Id.* Pedrolini then opined that "[t]his guy is so [expletive] honest, he's as honest as my own son." *Id.* Pedrolini concluded the conversation by agreeing to contact Von Reese later. *Id.*

21. A third recorded conversation between Pedrolini and Von Reese occurred on April 21, 1989. *Defendant's Exhibit Nos. 21D & E.* Von Reese gave Pedrolini directions to the Days Inn Hotel on State Route 54 and Interstate 75 in Pasco County. *Id.* No reference was made to a third party, such as Ware. *Id.*

22. It was Von Reese's understanding that the $58,000.00 would not be Pedrolini's money, which Von Reese immediately expressed to DEA Agent Michael Powers. *Von Reese's and Powers' Testimony.* Von Reese believed that this third person (Ware) either was the buyer/"money man" or protecting the buyer's interest. *Von Reese's Testimony.*

23. In the evening hours of Saturday, April 22, 1989, Ware and Pedrolini left Pedrolini's home in Kalamazoo, Michigan, for Pasco County, Florida. *Ware's Testimony; Defendant's Exhibit Nos. 5 & 5A (deposition testimony of Pedrolini).* Ware brought a black satchel, another little bag, and a black bag which had the money in it. *Defendant's Exhibit Nos. 5 & 5A.* Ware also brought a .22 caliber gun with him. *Defendant's Exhibit Nos. 25A & 84.* This gun was not registered to Ware; it was stolen. *Defendant's Exhibit No. 84.*

*EVIDENTIARY RULING:* The stolen nature of the gun was not known by Agent Hedges or the Government until late in the civil trial. In line with the Court's ruling on Ware's motion in limine, the fact that the gun was stolen is, therefore, admissible only as to the affirmative defense of guilt-in-fact.

24. Ware and Pedrolini took turns driving Pedrolini's car, a two-seated, 1984, champagne-colored Corvette. *Defendant's Exhibit Nos. 8 & 26.* Each drove about half (½) the way. *Ware's Testimony.*

### III. Events in Florida.

25. Pedrolini and Ware arrived in Pasco County, Florida, around 1:00 p.m. on Sunday, April 23, 1989. *Defendant's Exhibit Nos. 5 & 5A (deposition testimony of Pedrolini).* Ware checked into the Days Inn Hotel. *Ware's Testimony; Defendant's Exhibit Nos. 5 & 5A; Calhoun's Testimony; Edwards' Testimony.* Ware paid cash for the room and deposited enough money for one (1) key. *Calhoun's Testimony.* The check-in agent opined that Ware acted as if he was only staying one (1) night. *Id.*

*EVIDENTIARY RULING:* Pursuant to the Court's ruling on Ware's motion in limine, Pam Calhoun's Testimony is admissible only as to the Government's affirmative defense of guilt-in-fact; she was not asked to testify at either of Ware's criminal trials and there is no indication to the Court that Agent Hedges knew of her involvement.

26. Pedrolini telephoned Von Reese through a pay telephone at the Days Inn to let him know that they had arrived. *Defendant's Exhibit Nos. 5 & 5A (deposition testimony of Pedrolini).* Von Reese told Pedrolini to bring the money to his home; he was to come alone. *Id.; Von Reese's Testimony.*

27. Pedrolini returned to his and Ware's hotel room and asked Ware to make sure all the money was there. *Defendant's Exhibit Nos. 5 & 5A (deposition testimony of Pedrolini).* Ware said that he would count the money while Pedrolini took a shower. *Id.*

28. After Pedrolini finished his shower, Ware advised him that he was finished counting the money and that it was all there. *Defendant's Exhibit Nos. 5 & 5A (deposition testimony of Pedrolini).* Pedrolini was surprised that Ware had counted it so fast until he learned that the money was packaged in $1,000.00 bundles, albeit "messy" ones with mixed denominations and circulated, worn currency. *Id.; Von Reese's Testimony.*

29. Because the money was packaged in bundles, Ware was able to count it with his thumb and forefinger touching the ends of the bundles as opposed to the flat surfaces of the bills. *Defendant's Exhibit Nos. 5 & 5A (deposition testimony of Pedrolini).*

30. Ware transferred the money from his black bag to Pedrolini's brown bag, the same container that would be used to carry the cocaine. *Defendant's Exhibit Nos. 5 & 5A (deposition testimony of Pedrolini).*

31. With the money, Pedrolini drove to Von Reese's home. *Defendant's Exhibit Nos. 5 & 5A (deposition testimony of Pedrolini).* Ware stayed at the hotel. *Id.; Ware's Testimony.*

32. At Von Reese's home, Von Reese advised Pedrolini that he would have to spend the night at his home because the deal could not take place on Sunday, April 23, 1989. *Defendant's Exhibit Nos. 5 & 5A (deposition testimony of Pedrolini); Von Reese's Testimony.* Pedrolini called Ware from Von Reese's home to tell him that he would not be at the hotel Sunday night. *Id.* Pedrolini told Ware "not to worry" and that "everything will be handled tomorrow." *Id.* Von Reese overheard Pedrolini talking to Ware. *Von Reese's Testimony.*

33. The following morning, Monday, April 24, 1989, Von Reese and his wife, Tammy, counted the money. *Defendant's Exhibit Nos. 5 & 5A (deposition testimony of Pedrolini); Von Reese's Testimony.* The Von Reeses reorganized the money so that like denominations would be bundled together. *Von Reese's Testimony.* In the past, when Pedrolini had paid Von Reese cash, it was very neat and "ironed." *Id.* After reorganizing the money, the Von Reeses and Pedrolini put it in a shoebox and placed the shoebox in Pedrolini's brown bag. *Id.*

34. Later that morning, Pedrolini and Von Reese went to a Wal–Mart at the corner of state routes 54 and 41 to purchase cocaine from a supplier in a gray van. *Defendant's Exhibit Nos. 5 & 5A (deposition testimony of Pedrolini); Von Reese's Testimony.* Unbe-

knownst to Pedrolini, the supplier was an undercover DEA agent, Roger Vernoy. *Vernoy's Testimony.*

35. When Pedrolini, Von Reese, and Vernoy were inside the van, Vernoy exchanged four (4) kilograms of cocaine, packaged in plastic boxes, for $54,980.00 in cash from Pedrolini. *Vernoy's Testimony; Defendant's Exhibit Nos. 25 B & C (cocaine); Defendant's Exhibit No. 25D (cash).* Upon assurances from Von Reese that the money was all there, Vernoy did not count it while they were in the van. *Vernoy's Testimony.* Not taking time to personally examine the sealed cocaine, Pedrolini told Vernoy that he "and his partner were going to be immediately leaving Florida and heading back North." *Id.* Pedrolini also stated that his partner would be waiting out on a road near Interstate 75 as a "hitchhiker." *Id.*

36. With Von Reese's assistance, Pedrolini telephoned Ware from a pay phone near the Wal–Mart. *Defendant's Exhibit Nos. 5 & 5A (deposition testimony of Pedrolini); Von Reese's Testimony.* Pedrolini told Ware that everything was okay, to be ready to leave the hotel, and stand out front as if he were hitchhiking. *Von Reese's Testimony.* Pedrolini placed the brown bag in the hatch area of his corvette and left for the Days Inn. *Defendant's Exhibit Nos. 5 & 5A.*

37. Ware checked out of the Days Inn. *Ware's Testimony.* Pedrolini met Ware at the Chevron gas station adjacent to the Days Inn. *Id.; Defendant's Exhibit Nos. 5 & 5A (deposition testimony of Pedrolini).*

38. Pedrolini opened the clear glass hatch of the Corvette. *Defendant's Exhibit Nos. 5 & 5A (deposition testimony of Pedrolini); Defendant's Exhibit Nos. 8 & 26.* Pedrolini told Ware "there it is," to which Ware looked in the bag and responded "it's there?" *Defendant's Exhibit Nos. 5 & 5A.* Pedrolini replied affirmatively, and Ware placed his black bag in the car. *Id.*

39. Unbeknownst to Ware and Pedrolini, law enforcement officers observed Ware pacing outside the Days Inn before Pedrolini

arrived, *Sullivan's Testimony,* and leaning into the hatch of the Pedrolini's Corvette once he arrived, *Sullivan's and Nelson's Testimony,* which remained open for at least one (1) minute. *Sullivan's Testimony (up to five (5) minutes); Nelson's Testimony (more than one (1) minute).*

40. Pedrolini and Ware drove away from the gas station toward the highway. *Ware's, Sullivan's, and Nelson's Testimony.*

41. At approximately 1:27 p.m. on April 24, 1989, Pedrolini's Corvette, driven by Pedrolini, with Ware as a passenger, was stopped by officers employed by the Pasco County Sheriff's Office. *Amended Complaint at ¶ 28; Answer at ¶ 28.*

42. Agent Hedges was not at the scene of Ware's and Pedrolini's arrest. *Plaintiff's Exhibit No. 7 (deposition testimony of Agent Hedges).*

43. A search of the vehicle resulted in the police uncovering four (4) kilograms of cocaine. *Amended Complaint at ¶ 29; Answer at ¶ 29; stipulation in open court.* The cocaine was in the same tightly-wrapped condition it was in when Vernoy delivered it to Pedrolini. *Defendant's Exhibit Nos. 25B & C.*

44. Prior to being advised of his *Miranda* rights and arrested, Ware denied knowing Pedrolini to Pasco County Sheriffs Officer Umbaugh. *Umbaugh's Testimony.* Ware stated that he had been hitchhiking after visiting his sister in Clearwater, Florida. *Id.*

> *EVIDENTIARY RULING:* Even though these statements were suppressed at Ware's second criminal trial, they are admissible as to the essential element of lack of probable cause, at all stages of the prosecution up until the motion to suppress was granted. The statements are also admissible as to the Government's affirmative defense of guilt-in-fact.

45. After the Corvette was stopped and the cocaine was discovered, Ware and Pedrolini were arrested by state law enforcement officers employed by the Pasco County Sher-

iffs Office for violations of the drug trafficking laws of the State of Florida. Ware and Pedrolini were taken to the Pasco County jail. *Amended Complaint at ¶¶ 8 & 30; Answer at ¶¶ 8 & 30.*

46. In a post-arrest interview, Ware denied any involvement with the cocaine deal and advised state law enforcement to check the cocaine for fingerprints. *Sullivan's Testimony.* Ware did not suggest that the money should be fingerprinted. *Id.*

47. Sometime after his arrest, Ware telephoned Dirk Bartley and advised him to "get out of the business." *Bartley's Testimony.*

> *EVIDENTIARY RULING:* As the Court ruled *supra,* Dirk Bartley's testimony is not relevant to any of the essential elements of malicious prosecution. However, it is relevant to the Government's affirmative defense of guilt-in-fact. At the very least, it shows consciousness of guilt.

48. After his arrest, Pedrolini initially told state law enforcement that he did not know to whom the cocaine in the hatch belonged. *Sullivan's Testimony.* Later, Pedrolini changed his statement to knowing about the cocaine because he was delivering it to "Mike," someone he has met in a bar up North. *Nelson's Testimony.* At the time, it was Pedrolini's intent to protect Ware. *Defendant's Exhibit Nos. 5 & 5A (deposition testimony of Pedrolini).* However, after someone in the jail advised Pedrolini that Ware would leave him "holding the bag," Pedrolini confessed to Officer Sullivan that he and Ware were partners in the cocaine purchase, the cocaine was for Ware and his "people," and Ware—the "money man"—was responsible for acquiring and protecting the cash. *Id.*

49. Soon thereafter, Pedrolini relayed these same statements to Agent Hedges. *Plaintiff's Exhibit No. 7 (deposition testimony of Agent Hedges).* No evidence was introduced regarding whether Pedrolini testified before the federal grand jury.

## IV. Federal Criminal Case.

50. After the state arrest, the United States Attorney's Office for the Middle Dis-

trict of Florida, through AUSA Furr, decided to charge Ware and Pedrolini with federal drug offenses and present the case to a federal grand jury sitting in Tampa, Florida. *Furr's Testimony.* Agent Hedges was involved in this process. *Plaintiff's Exhibit No. 7 (deposition testimony of Agent Hedges).* On or about May 11, 1989, the grand jury returned a true bill indictment in the matter of *United States of America v. George Pedrolini and Frank Ware, a/k/a George Pedrocini,* Case No. 89–92–Cr–T–15A, charging Ware and Pedrolini with two (2) counts of violations of the Controlled Substances Act, each punishable by ten (10) years or more in prison. The indictment read, in pertinent part:

The Grand Jury charges:

### COUNT ONE

From on or about April 1, 1989, until on or about April 24, 1989, in the Middle District of Florida and elsewhere, the defendants ... did intentionally, unlawfully, willfully and knowingly combine, conspire, confederate and agree together and with each other and with and among persons unknown to the Grand Jury to possess with the intent to distribute five hundred (500) grams or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, contrary to the provisions of Title 21, United States code, Section 841(a)(1).

All in violation of Title 21, United States Code, Section 846.

### COUNT TWO

On or about April 24, 1989, in the Middle District of Florida, the defendants ... did knowingly, intentionally and unlawfully possess with the intent to distribute five hundred (500) grams or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II Controlled Substance.

All in violation of Title 21, United States Code, Sections 841(a)(1), and Title 18, United States Code, Section 2.

*Defendant's Exhibit No. 13.* The indictment was signed by the grand jury foreperson, AUSA Furr, and Chief AUSA, Criminal Division, Terry A. Zitek. The typewritten name of then—United States Attorney, Robert W. Genzman, also appears on the second page of the indictment. *Id.*

51. On or about May 11, 1989, following the return of the above grand jury indictment and pursuant to federal arrest warrants issued thereto, Ware and Pedrolini were federally arrested, and subsequently transferred to the Hillsborough County Jail, in Tampa, Florida, pursuant to a contract between the United States Marshals Service and the Hillsborough County Jail for use of the jail facilities for the temporary custody of federal defendants. *Amended Complaint at ¶ 31; Answer at ¶ 31.*

52. Soon after his federal arrest, Ware requested a meeting with Agent Hedges. *Ware's Testimony.* Ware had never met Agent Hedges prior to the federal indictment. *Id.* Although Ware asked Agent Hedges to look into certain things, their relationship was not an outwardly hostile one. *Id.*

53. On or about May 18, 1989, Ware and Pedrolini appeared before the Honorable Paul Game, Jr., United States Magistrate Judge, for an initial appearance and detention hearing. Ware was represented at this hearing by then—Assistant Federal Public Defender Mark Pizzo,[17] who objected to the magistrate judge's basing his order only upon the Government's proffer of evidence. As such, the Government advanced one (1) witness, FBI Agent Edwards. Agent Edwards was not present at Ware's arrest. The source of Agent Edwards' knowledge was various police reports and witnesses. Agent Edwards testified that, upon arrest, the police found approximately one (1) gram

---

**17.** Currently, Mark Pizzo is a U.S. Magistrate Judge with the Tampa Division of the Middle District of Florida.

of cocaine in the console and approximately four (4) kilograms of cocaine in a travel bag in the rear compartment of the Corvette. Agent Edwards further testified that Pedrolini told the police that Ware was an active participant in the drug deal. After cross examination by AFPD Pizzo, the magistrate judge granted the Government's motion to detain Ware, finding that: (1) there was probable cause to believe that Ware committed the charged offenses; (2) Ware failed to rebut the statutory presumption of detention; (3) there was a serious risk that Ware would flee; and (4) there was clear and convincing evidence that Ware was a principal in the charged offenses. *Defendant's Exhibit Nos. 14 & 15.*

54. On or about June 6, 1989, Agent Hedges sent a written request to the Identification Division, Latent Fingerprint Section of the FBI in Washington, D.C., to conduct "the necessary latent exams in order to locate fingerprint evidence to assist the Tampa Division in the successful prosecution against Frank Ware to be conducted on or about 6/24/89." Along with the written request, Agent Hedges forwarded the $54,980.00 in U.S. currency that Pedrolini had delivered to Vernoy in exchange for approximately four (4) kilograms of cocaine. *Amended Complaint at ¶ 16; Answer at ¶ 16; Plaintiff's Exhibit No. 1.*

55. Agent Hedges asked for a fingerprint analysis on the money to see if it would corroborate Pedrolini's statement that Ware was the buyer/"money man." *Plaintiff's Exhibit No. 7 (deposition testimony of Agent Hedges).* However, Agent Hedges did not believe that the fingerprint analysis was necessary because the prosecution of Ware would have continued regardless of the results. *Id.*

56. On or about June 20, 1989, Mr. Marvin Jackson, Esq., court-appointed counsel for Ware's first criminal trial, filed a motion for *Brady* [18] material. *Criminal Case File, Docket No. 45; Amended Complaint at ¶ 48; Answer at ¶ 48.*

57. On or about July 7, 1989, the Latent Fingerprint Section of the Identification Division of the FBI sent a letter to the FBI's Tampa Resident Agency advising that "sixty-eight [68] fingerprints and two [2] latent palm prints of value were developed on sixty-one [61] of the bills. No latent prints of value were developed on the remaining bills. The latent prints are not the fingerprints or palm prints of Ware." *Amended Complaint at ¶ 17; Answer at ¶ 17; Plaintiff's Exhibit No. 2; Defendant's Exhibit No. 35.*

58. On or about July 10, 1989—prior to Ware's first criminal trial—a copy of the FBI's Report of Latent Fingerprint Section, Identification Division, was received by the FBI's Tampa, Florida, field office. *Amended Complaint at ¶ 49; Answer at ¶ 49.* This report was filed in the ordinary course of FBI operations within a few days of its receipt. *Ferrante's Testimony.* It was routed to Agent Hedges and he actually received the report. *Plaintiff's Exhibit No. 7 (deposition testimony of Agent Hedges).*

59. Agent Hedges perceived the FBI fingerprint report to be "negative" because it did not corroborate Pedrolini's statement that Ware was the cocaine buyer/"money man." *Plaintiff's Exhibit No. 7 (deposition testimony of Agent Hedges).* Agent Hedges did not believe that report proved Pedrolini to be a liar. *Id.* Rather, Agent Hedges opined that Ware's fingerprints could have been incapable of being developed. *Id.*

60. Agent Hedges did not examine the report to see if it was exculpatory in nature. *Plaintiff's Exhibit No. 7 (deposition testimony of Agent Hedges).* He did not discuss discovery matters with AUSA Moore. *Id.* Thus, Agent Hedges did not personally deliver the FBI fingerprint report to AUSA Moore or otherwise expressly advise him of its existence. *Id.* Rather, in accordance with the standard practice of the FBI at the time, Agent Hedges placed the fingerprint report in the investigative file. *Id.*

61. AUSA Moore had access to the investigative file that contained the fingerprint

18. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

report. *Plaintiff's Exhibit No. 7 (deposition testimony of Agent Hedges); Furr's Testimony.* AUSA Moore looked in this file prior to Ware's first criminal trial. *Plaintiff's Exhibit No. 7.* At the very least, AUSA Moore had constructive knowledge of the fingerprint report. *Id.*

62. The fingerprint report was not disclosed to Ware or his attorney anytime prior to, or during, the first criminal trial. *Ware's Testimony.*

63. Sometime prior to Ware's first criminal trial, Pedrolini entered into a plea agreement with the Government. *Defendant's Exhibit Nos. 5 & 5A (deposition testimony of Pedrolini).* He promised to testify truthfully in the course of the Government's prosecution of Ware. *Id.* In or about October, 1989, Pedrolini's guilty plea as to Count I of the indictment was accepted by the district court and he was sentenced to seven (7) years and three (3) months in prison. *Id.*[19]

64. On or about August 7, 1989, Ware's first criminal trial commenced before the Honorable William J. Castagna, United States District Judge,[20] and a duly constituted twelve (12) person jury. *Amended Complaint at ¶ 49; Answer at ¶¶ 49–50.*

65. AUSA Moore was the prosecutor of record for the first criminal trial. *Ware's Testimony.* Agent Hedges was the law enforcement representative who sat at counsel table. *Plaintiff's Exhibit No. 7 (deposition testimony of Agent Hedges).* Pedrolini testified for the prosecution. *Defendant's Exhibit Nos. 5 & 5A (deposition testimony of Pedrolini).* Ware was represented by appointed counsel, Marvin Jackson, Esq. *Ware's Testimony.* Counsel cross-examined Pedrolini. *Id.* Officer Umbaugh also testified for the prosecution, and his testimony included Ware's pre-arrest statements about hitchhiking and visiting his sister in Clearwater. *Umbaugh's Testimony.*

66. After the Government rested, Ware testified and was cross-examined by AUSA

Moore. *Ware's Testimony.* No other defense witnesses were called. *Id.* No further factual information about the first trial is properly before the Court, in that the transcript was not offered for identification or admitted into evidence. *E.g., Clerk's Minutes (Docket No. 190, listing the transcript of the first criminal trial as a potential defense exhibit).*

67. On August 7, 1989, the jury returned a verdict finding Ware guilty of both offenses charged in the indictment, and Judge Castagna adjudicated Ware guilty of said offenses. Judge Castagna subsequently sentenced Ware to serve a term of imprisonment of one hundred thirty-six (136) months. Ware was later transferred from the Hillsborough County Jail to the Federal Correctional Institute in Milan, Michigan. *Amended Complaint at ¶ 50; Answer at ¶ 50.* This institute is a medium security prison. *Ware's Testimony.*

68. On or about March 15, 1991, while incarcerated, Ware submitted a request to the FBI pursuant to the Freedom of Information Act (FOIA). *Amended Complaint at ¶ 63; Answer at ¶ 63.*

69. In October of 1991, Ware received a response to the FOIA request, including a copy of the July 7, 1989, FBI fingerprint report. *Amended Complaint at ¶ 64; Answer at ¶ 64.*

70. In December of 1991, Ware filed a motion for writ of error coram nobis with the district court, which was construed as a motion to vacate under 28 U.S.C. § 2255. *Amended Complaint at ¶ 66; Answer at ¶ 66; Plaintiff's Exhibit No. 3.* Ware argued that he should receive a new trial based on the Government's failure to disclose the FBI fingerprint report prior to the first criminal trial. *See Plaintiff's Exhibit No. 3.*

71. In February of 1992, Judge Castagna granted Ware's motion, vacated his prior conviction and sentence, and ordered a new

---

**19.** Count II was apparently dismissed from the indictment.

**20.** Now Senior U.S. District Judge Castagna.

trial. *Amended Complaint at* ¶ *67; Answer at* ¶ *67; Plaintiff's Exhibit No. 3.* Judge Castagna held that (1) the Government's actions constituted a *Brady* violation, and (2) there was "a reasonable probability that the jury would have reached a different outcome had it known that none of the sixty eight fingerprints found on the money were Ware's." *Plaintiff's Exhibit No. 3.*

72. On or about May 19, 1992, Ware's new criminal trial commenced before the Honorable Steven D. Merryday, United States District Judge, and a duly constituted twelve (12) person jury. *Amended Complaint at* ¶ *68; Answer at* ¶ *68.*

73. At the second trial, AUSA Moore served again as the prosecutor of record. *Ware's Testimony.* Similarly, Agent Hedges was the law enforcement representative who sat at counsel table. *Plaintiff's Exhibit No. 7 (deposition testimony of Agent Hedges).* Pedrolini testified for the prosecution and was cross-examined by defense counsel. *Defendant's Exhibit Nos. 5 & 5A (deposition testimony of Pedrolini).* Pedrolini had received open heart surgery between the first and second criminal trials. *Id.* Officer Umbaugh was not allowed to testify as to Ware's pre-arrest statements; they were suppressed by the trial judge. *Umbaugh's Testimony.*

74. At the close of the Government's case-in-chief, Ware moved for a judgment of acquittal pursuant to Fed.R.Crim.P. 29. *Defendant's Exhibit No. 57.* Judge Merryday denied the motion, reasoning that Pedrolini's testimony was sufficient to establish a *prima facie* case of the offenses charged in the indictment. *Id.*

75. Ware was represented by a different attorney at the second trial, Ellen Leesfield, Esq. *Ware's Testimony.* The defense called at least five (5) witnesses, one of which was Burgheis. *Ware's Testimony; Plaintiff's Exhibit No. 13.* Ware did not testify, although defense counsel was under the impression that he would throughout the Government's case-in-chief. *Ware's Testimony.* Ware chose not to testify because he did not want Officer Umbaugh to testify about his pre-arrest statements. *Id.* No further factual information about the first trial is properly before the Court, in that the transcript was not offered for identification or admitted into evidence. *E.g., Clerk's Minutes (Docket No. 190, listing the transcript of the second criminal trial as a potential defense exhibit).*

76. On or about May 22, 1992, the jury acquitted Ware of both offenses charged in the indictment and, by order dated May 30, 1992, Judge Merryday adjudicated Ware not guilty of said offenses. *Amended Complaint at* ¶ *68; Answer at* ¶ *68; Plaintiff's Exhibit No. 4.*

77. Ware was incarcerated for approximately three (3) years and twenty-two (22) days from the time of his initial arrest until his release. *Ware's Testimony.*

## V. Credibility Assessment.

78. In rendering the above findings of fact, the Court has obviously had to resolve conflicts in the testimony and evidence presented. The most significant conflict was the direct contradiction between Ware's and Pedrolini's respective testimony.

79. Upon due consideration, the Court finds Pedrolini to be a more credible, truthful witness than plaintiff Ware in all material respects.

80. Time and again Ware's testimony was impeached with his prior deposition testimony, *e.g., Defendant's Exhibit Nos. 45, 54, & 55*, prior inconsistent statements, *e.g., Defendant's Exhibit No. 27*, documentary evidence, *e.g., Defendant's Exhibit Nos. 6A, 6B, 6C, & 51*, and the testimony of multiple defense witnesses who completely contradicted Ware on key aspects of his story, *e.g., Calhoun's, Bartley's, and Fields' Testimony.* Ware also appeared to be intentionally evasive at times. *E.g., Ware's Testimony on October 16, 1996 (stating that "a lot of this is vague" with regard to Ware's stay in Florida).* Finally, a common sense review of Ware's testimony reveals disturbing inconsistencies. For example, Ware could not have lawfully afforded his lifestyle and travel habits on the nominal

amount of income Ware claimed to have made after leaving General Motors. *Ware's Testimony; see also infra Conclusions of Law ¶ 78.*

81. By finding Pedrolini more credible than Ware, the Court is not suggesting that Pedrolini was a perfect witness. He made prior inconsistent statements to law enforcement shortly after his initial arrest. However, Pedrolini took affirmative steps to rectify these false statements. More importantly, Pedrolini's deposition testimony, *Defendant's Exhibit Nos. 5 & 5A,* is materially consistent with his prior court testimony and is corroborated by the testimony of other witnesses.

82. Contrary to Ware's assertion, the FBI fingerprint report does not render Pedrolini's testimony incredible as a matter of law. Consistent with Judge Castagna's order granting Ware a new trial, *Plaintiff's Exhibit No. 3,* and this Court's prior ruling that the report was exculpatory *Brady* material, the jury in Ware's second criminal trial may very well have found reasonable doubt in Pedrolini's testimony after comparing it to the fingerprint report. On the other hand, the fingerprint report may have had little or no impact on the jury's decision to acquit Ware. One can only speculate as to the report's actual impact on the jury because it was one of many differences between the first and second criminal trials.

83. Regardless of the jury's evaluation of the evidence introduced in the second criminal trial, this Court, as the trier of fact of this civil case, finds that, while the FBI report may not have bolstered Pedrolini's credibility, it certainly did not erode Pedrolini's credibility to the degree that his testimony becomes less credible than Ware's. As opined by ATF fingerprint specialist Richard Canty, there are many legitimate, scientific obstacles to retrieving latent prints from currency that has been widely circulated. *Canty's Testimony.* Cash, in general, is a poor medium for fingerprints. *Id.* This is especially true where, as here, stacks of bundled cash are handled by a person's fingertips on the ends of the bills. *Id.* Therefore, Pedrolini's

testimony that Ware acquired the money and that Ware had counted it in its bundled form is not inconsistent with the FBI's conclusion that none of the sixty-eight (68) latent prints discovered on the cash were Ware's.

**EVIDENTIARY RULING:** At trial, Ware objected to Canty's testimony, on the grounds that it was irrelevant in light of the Court's determination that the fingerprint report was *Brady* material. The Court deferred ruling. Ware's objection is hereby **OVERRULED.**

84. To the extent not discussed above, the Court resolved conflicts in the evidence in favor of the witness(es) and/or exhibit(s) cited after the corresponding finding of fact. Contradictory, uncited witnesses and exhibits were rejected by the Court as less credible than those cited (and those uncited but corroborative).

### CONCLUSIONS OF LAW

Ware seeks damages from the Government under the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.* Specifically, Ware alleges that the Government committed the tort of malicious continuation of prosecution, as defined by Florida law, through the acts and/or omissions of FBI Agent Hedges. The Government disputes liability on the elements, raises the affirmative defense of guilt-in-fact, and moves to dismiss for failure to exhaust administrative remedies.

1. This Court has original and exclusive jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1346(b); Venue is proper pursuant to 28 U.S.C. § 1391(b)(2), (e)(2).

2. Florida common law governs all substantive aspects of Ware's claim for malicious continuation of prosecution, including any affirmative defenses, in that the alleged tortious conduct occurred in the State of Florida. 28 U.S.C. § 1346(b).

*I. The Elements of Malicious Continuation of Prosecution.*

3. As recently restated by the Supreme Court of Florida:

In order to prevail in a malicious prosecution action, a plaintiff must establish that: ■ an original criminal or civil judicial proceeding against the present plaintiff was commenced or continued; (2) the present defendant was the legal cause of the original proceeding against the present plaintiff as the defendant in the original proceeding; (3) the termination of the original proceeding constituted a bona fide termination of that proceeding in favor of the present plaintiff; (4) there was an absence of probable cause for the original proceeding; (5) there was malice on the part of the present defendant; and (6) the plaintiff suffered damage as a result of the original proceeding.

*Alamo Rent–A–Car, Inc. v. Mancusi*, 632 So.2d 1352, 1355 (Fla.1994). The failure of Ware to establish any one (1) of these six (6) elements is fatal to his claim. *Id.*

■ 4. As to all six (6) elements, Ware bears the burden of proof, the standard of which is a preponderance of competent evidence. *E.g., Phelan v. City of Coral Gables*, 415 So.2d 1292, 1294 (Fla. 3d DCA 1982).

■ 5. Although Ware asserts a claim for "malicious continuation of prosecution," the Court will construe this claim as one for "malicious prosecution," as it is more commonly referred to under Florida common law. The only discernable difference between the two (2) torts is that the former focuses on the *continuation* of an original criminal proceeding, while the latter focuses on the *commencement* of the proceeding. *See Alamo*, 632 So.2d at 1355; *see also Harris v. Lewis State Bank*, 482 So.2d 1378, 1381 (Fla. 1st DCA 1986) (noting that a defendant may be liable for malicious prosecution if he "*continued* the prosecution or gave it momentum") (emphasis added); *cf. Dirienzo v. United States*, 690 F.Supp. 1149 (D.Conn. 1988) (involving the tort of malicious continuation of prosecution, as defined by New York law). Because Ware "does not make a claim for malicious prosecution with respect to the initiation of the proceedings against him," 838 F.Supp. at 1563, the Court will temporally adjust its analysis to the extent that this distinction merits it.

### A. Original Criminal Proceeding.

■ 6. Ware proved the first element, that "an original criminal or civil judicial proceeding against the present plaintiff was commenced or continued." *Alamo*, 632 So.2d at 1355. Criminal proceedings against Ware commenced on May 11, 1989, when the grand jury returned an indictment. *See Miami Herald Publishing Co. v. Ferre*, 636 F.Supp. 970, 978 (S.D.Fla.1985). These proceedings continued through the first criminal trial and conviction until May 22, 1992, when the second jury acquitted Ware of the offenses charged in the indictment.

### B. Legal Cause.

■ 7. Ware proved the second element, that the Government was the legal cause of the criminal proceedings against him. As the Court previously emphasized, the Government's liability hinges on the legal significance of Agent Hedges' acts and/or omissions. 838 F.Supp. at 1563–64. The issue, then, is whether Agent Hedges' conduct was "the proximate and efficient cause of putting the law in motion." *Harris v. Lewis State Bank*, 482 So.2d 1378, 1381 (Fla. 1st DCA 1986). The parties do not, and cannot, seriously dispute the fact that Agent Hedges played a key role in Ware's prosecution. Agent Hedges made the decision to "do the sting" on co-defendant Pedrolini, planned it, and coordinated efforts with the local sheriffs office to arrest him. Although Agent Hedges was not at the scene of Ware's arrest, he obtained the money that Pedrolini had delivered to Von Reese and eventually sent it to the FBI in Washington for a fingerprint analysis. The results of the fingerprint analysis, revealing that none of the latent prints were Ware's, were directed to the attention of Agent Hedges.

8. Basically, Agent Hedges produced and gathered the Government's evidence against Ware. His active, pivotal role in both the investigation and prosecution of Ware is cor-

roborated by the fact that he sat at counsel table during both criminal trials. It is true that the lead prosecutor, AUSA Dennis Moore, ultimately controlled the trial and prosecution of Ware on behalf of the Government. *See Dirienzo v. United States,* 690 F.Supp. 1149, 1158 (D.Conn.1988) (citing Restatement (2d) Torts § 655, cmmt. c (1977), but otherwise applying New York law). However, the Government cannot escape liability simply because Agent Hedges "was not the prosecutor of record." *Harris,* 482 So.2d at 1381. Because of his "active part in the proceedings," *Dirienzo,* 690 F.Supp. at 1158, the Court concludes that Agent Hedges (and thus the Government) was the legal cause of the criminal proceedings against Ware.

### C. Favorable Termination.

9. It is undisputed that Ware proved the third element, that the termination of the criminal proceeding constituted a bona fide termination of that proceeding in his favor. On May 22, 1992, a jury acquitted Ware of both drug offenses and, by order dated May 30, 1992, U.S. District Judge Merryday adjudicated him not guilty. *Plaintiff's Exhibit No. 4.*

### D. Absence of Probable Cause.

10. Ware failed to prove the fourth element, that "there was an absence of probable cause for the original proceeding." *Alamo,* 632 So.2d at 1355. The plaintiff's burden of proof in an action for malicious prosecution has been described as a "heavy" one. *Burns v. GCC Beverages, Inc.,* 502 So.2d 1217, 1219 (Fla.1986). This adjective is especially appropriate, in that the plaintiff's burden of proof "includes the onerous requirement of proving that the criminal proceeding was initiated by the defendant without probable cause, i.e., without a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense with which he is charged." *Id.*

11. The first issue with regard to this element is at what stage of the criminal proceedings should the Court analyze probable cause. Ware argues that, for purposes of his claim, the appropriate point in time is "the eve of his first trial," rather than the initiation of criminal proceedings. (Docket No. 224, p.27). The Government does not point to a particular point in time, but responses that, at all times during Ware's prosecution, probable cause existed. (Docket No. 226, p.17). Ware maintains, however, that any information acquired by Agent Hedges after the first jury was impaneled should not be considered in the instant probable cause determination.

12. Inherent in the phrase malicious *continuation* of prosecution is the notion that probable cause must be lacking at all stages of the prosecution, from indictment to acquittal, in order for the present plaintiff to prevail. The Court, therefore, disagrees with Ware's position that the only pertinent probable cause determination is at the eve of the first criminal trial. However, the Court concurs with Ware that any information acquired by the Government after his criminal acquittal, such as evidence regarding Ware's character and reputation, is irrelevant to the probable cause element.[21]

13. Accordingly, the Court will analyze probable cause at all distinct stages of the Government's prosecution of Ware.

#### (i) Indictment.

14. First, the Court concludes that there was probable cause to prosecute Ware at the time the grand jury returned the indictment and commanded his arrest.

15. Because federal grand jury proceedings are *ex parte,* Fed.R.Crim.P. 6(e), the return of an indictment is *prima facie* evidence of probable cause in an action for malicious prosecution. *See Burns v. GCC Beverages, Inc.,* 502 So.2d 1217, 1219 (Fla.

21. However, post-acquittal evidence of Ware's guilt is relevant to the Government's affirmative defense, as ruled *supra.*

1986) (Barkett, J., for the court). In *Burns,* the supreme court was faced with the issue of whether a state magistrate's issuance of an arrest warrant based upon his or her finding of probable cause in an *ex parte* proceeding gave rise to a conclusive presumption of probable cause in a subsequent action for malicious prosecution. *Id.* at 1217. The court answered the question in the negative, reasoning that, unlike adversarial proceedings, the defendant does not have the opportunity to be heard at an *ex parte* proceeding. *Id.* at 1219. Nevertheless, the court still affirmed the result of the lower courts' rulings because, even without the presumption, the malicious prosecution plaintiff failed to show a genuine issue of fact regarding absence of probable cause. *Id.* at 1220.

■ 16. Just as the *Burns* plaintiff had "no opportunity to even know what was being presented to the magistrate much less refute it," *id.* at 1219, Ware had no opportunity to know or challenge what was being presented to the grand jury. The proceeding was in camera and *ex parte.* Fed. R.Crim.P. 6(e). Therefore, contrary to the Government's position, the Court concludes that a grand jury indictment is merely some evidence of probable cause to initiate prosecution in an action for malicious prosecution. *Accord Kelly v. Serna,* 87 F.3d 1235 (11th Cir.1996) (holding that a grand jury indictment constitutes *prima facie* evidence that probable cause existed for prosecution in a subsequent action for malicious prosecution under Georgia law). The federal Supreme Court cases cited by the Government, *e.g.,* *Costello v. United States,* 350 U.S. 359, 363, 76 S.Ct. 406, 408–09, 100 L.Ed. 397 (1956), are not on point because their holdings interpret the Due Process Clause and other components of the Fifth Amendment. They have absolutely nothing to do with the common law tort of malicious prosecution.

17. Nevertheless, Ware has not presented any evidence that Agent Hedges should, or could, have stopped AUSA Furr and the Government from presenting the case to the grand jury. Rather, the indictment and the ensuing arrest warrant stand alone as evidence that probable cause existed to commence criminal proceedings against Ware. Indeed, the Court believes the return of an indictment to be even more convincing than the filing of an information, which alone constitutes evidence of reasonable grounds for prosecution. *Phelan v. City of Coral Gables,* 415 So.2d 1292, 1295 (Fla. 3d DCA 1982). Determining whether probable cause exists and protecting citizens against unfounded criminal prosecutions are the "basic functions" of the grand jury. *United States v. DiBernardo,* 775 F.2d 1470, 1476 (11th Cir. 1985). In this case, at least twelve (12) jurors found probable cause to believe that Ware committed two (2) federal drug offenses. Ware has not given this Court any reason not to defer to this finding.

### *(ii) Detention Hearing.*

■ 18. Just as Ware fails to prove that the Government commenced criminal proceedings against him without probable cause, he fails to prove that the Government, through Agent Hedges, lacked probable cause to continue prosecution at the time of the detention hearing.

■ 19. In Florida, a pre-trial, adversarial probable cause determination is conclusive evidence of probable cause in a subsequent action for malicious prosecution, absent fraud, perjury, or other corrupt means employed by the person responsible for continuing the prosecution. *Colonial Stores, Inc. v. Scarbrough,* 355 So.2d 1181, 1184 (Fla.1977). This pre-trial determination of probable cause is worthy of deference because the malicious prosecution plaintiff had the opportunity to know of and challenge the preliminary evidence against him. *Burns v. GCC Beverages, Inc.,* 502 So.2d 1217, 1219 (Fla.1986); *Gallucci v. Milavic,* 100 So.2d 375, 377 (Fla.1958) (recognizing the presumption of probable cause derived from a ruling of a justice of the peace that plaintiff should answer state's criminal charges following a preliminary hearing at which plaintiff said nothing).

20. Presently, as it did in 1989, the federal criminal justice system requires that a

detention hearing be held if the Government seeks pre-trial detention. 18 U.S.C. § 3142(f) (1988). The defendant has the right to be represented by counsel, to testify, to present witnesses, to proffer information, and to cross-examine witnesses who appear at the hearing. *Id.* § 3142(f)(2). As relevant to the instant case, if there is probable cause to believe that the defendant has committed an offense arising under the Controlled Substances Act, 21 U.S.C. § 801, *et seq.*, it is rebuttably presumed that he or she shall be detained pending trial. 18 U.S.C. § 3142(e).

21. The judicial officer may either make the probable cause determination himself—as Magistrate Judge Game did—or defer to the grand jury's determination as evidenced by the indictment. *E.g., United States v. Arredondo*, No. 96–247–Cr–T–17B, 1996 WL 521396, *3 (M.D.Fla. Sept. 11, 1996) (Kovachevich, C.J.). Assuming the existence of probable cause and the defendant's ability to rebut the presumption of detention, the judicial officer must consider the following factors in deciding whether or not to detain a defendant pending trial: (1) the nature and circumstances of the offense charged, (2) the weight of the evidence against the defendant, (3) the history and characteristics of the defendant, and (4) the nature and seriousness of danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g). While the rules of evidence do not apply to detention hearings, *United States v. Gaviria*, 828 F.2d 667, 669 (11th Cir.1987), hearsay evidence must be reliable in order to be considered by the court. *Gerstein v. Pugh*, 420 U.S. 103, 125 n. 25, 95 S.Ct. 854, 868–69 n. 25, 43 L.Ed.2d 54 (1975).

22. In the present case, Ware appeared before the Honorable Paul Game, Jr., United States Magistrate Judge, for an initial appearance and detention hearing within seven (7) days of his federal arrest. Ware was represented by counsel, who challenged the Government's evidence through cross-examination and argument. Equally subject to challenge was Pedrolini's hearsay statements

to law enforcement about Ware's active participation in the cocaine deal, as relayed by Agent Edwards. At the conclusion of the adversarial hearing, Magistrate Judge Game expressly found probable cause to believe that Ware had committed the charged offenses and was even clearly convinced that Ware was a principal. For these and other reasons, Ware was detained pending trial.

23. Ware fails to specifically point out any fraud or other corrupt means employed by Agent Hedges at this stage of the prosecution.

24. However, portions of Ware's closing argument could be construed as an effort to point out corrupt means by Agent Hedges. It is true that, at the time of the detention hearing, Agent Hedges had not yet requested a fingerprint analysis of the cash. Ware argues that Pedrolini was too unreliable for the Government to believe without independent corroboration, and the Court will address this argument in the next subsection of this Order. Given this argument, Ware presumably contends that Agent Hedges' failure to verify the truth of Pedrolini's statements at the time of the detention hearing "corrupted" the magistrate judge's finding of probable cause.

25. The Court concludes that there was no "corruption" because Pedrolini's statements were sufficiently trustworthy at the time of the detention hearing. The detention hearing was held within days of the return of the federal indictment. Agent Hedges had just begun to gather evidence in anticipation of trial. The fingerprint report was not "readily obtainable" at this early stage. *Harris v. Lewis State Bank*, 482 So.2d 1378, 1382 (Fla. 1st DCA 1986). More importantly, Pedrolini's hearsay statements were subject to cross examination by Ware. Any dispute over Pedrolini's "reliability" could, and should, have been raised by Ware. By finding probable cause to believe that Ware had committed the offenses charged in the indictment, Magistrate Judge Game presumably found Pedrolini's hearsay statement sufficiently reliable and corroborated by the other evidence.

26. Even if, for the sake of argument, Agent Hedges had a duty to independently verify Pedrolini's statements before allowing Agent Edwards to testify as to their content, the Court concludes that an unintentional breach of that duty would not rise to the level of fraud or corruption required to rebut the presumption of probable cause. At trial, there was absolutely no testimony or evidence to support a finding that, on May 18, 1989, Agent Hedges knew or should have known that Pedrolini's statements were unworthy of reliance. Rather, if there was any reasonable hesitation about Pedrolini's reliability, certainly the magistrate judge—taking an objective and impartial view of the evidence, including Pedrolini's statements and the circumstances under which they were made—would have said so.

27. Therefore, any failure on Agent Hedges' part to verify Pedrolini's credibility at the time of the detention hearing was neither intentional, fraudulent, nor otherwise corrupt. As such, the finding of probable cause by Magistrate Judge Game stands unrebutted.

### (iii) Commencement of the First Trial.

28. The Court concludes that the Government, through Agent Hedges, had probable cause to continue Ware's prosecution on the eve/commencement of the first criminal trial. With regard to the element of lack of probable cause, this point in time is the most disputed stage of the criminal proceedings.

29. Ware argues that the undisclosed existence of the FBI fingerprint report, which states that none of the sixty-eight (68) latent prints found on the cash were his, "tainted" whatever probable cause Agent Hedges had to initiate prosecution. Ware contends that this report exonerated Ware as a matter of law by proving Pedrolini, whose testimony was dispositive of Ware's criminal liability, to be completely unreliable.

30. The Government argues that Ware's conviction in 1989 constitutes conclusive evidence of probable cause absent fraud, perjury, or other corrupt means. The Government contends that the subsequent vacation of this conviction due to a *Brady* violation does not rise to the level of fraud, perjury, or other corrupt means.

31. The Government correctly points out that, under Florida law, an initial conviction gives rise to a conclusive presumption of probable cause for prosecution, absent proof that the conviction was procured by "fraud, perjury, or subornation of perjury, or other unfair conduct on the part of the defendant[.]" *Padrevita v. City of Lake Worth*, 367 So.2d 739, 742 (Fla. 4th DCA 1979). This presumption stands "regardless of any appellate disposition of the conviction." *Id.* at 741. "Other unfair conduct" must amount to fraud, either extrinsic or intrinsic, in order for the presumption to be rebutted. *Id.* at 742.

32. Although *Padrevita* is a pleadings case that apparently conflicts with a Third District decision, *Community National Bank of Bal Harbour v. Burt*, 183 So.2d 731 (Fla. 3d DCA), *cert. denied*, 188 So.2d 820 (Fla. 1966), the Court finds *Padrevita* sufficiently persuasive for evaluating the significance of Ware's initial conviction. *Padrevita* was decided thirteen (13) years after *Burt* and its reasoning is more sound. In any event, the conflict between *Padrevita* and *Burt* is on a point not relevant to Ware's case.

33. Ware fails to rebut the presumption of probable cause to proceed with the first criminal trial. Agent Hedges' failure to disclose the FBI fingerprint report—which he actually possessed at the time of the first criminal trial—does not amount to the only arguable ground to rebut the presumption, subornation of perjury on the part of Pedrolini. While the fingerprint report is exculpatory in nature and relevant to Pedrolini's credibility, it does not render perjurious Pedrolini's testimony that Ware was the cocaine buyer/"money man." Rather, as the Court has found *supra, Findings of Fact* at ¶ 83, the fingerprint report is not inconsistent with Pedrolini's testimony.

34. Make no mistake about it, the prosecution breached its constitutional obligation

to disclose the fingerprint report to Ware. However, this breach was remedied by Judge Castagna when he vacated Ware's conviction and granted him a new trial. Judge Castagna's order is the functional equivalent of the circuit court's reversal of the county court conviction in *Padrevita;* it did not affect the presumption of probable cause.

35. The case law relied upon by Ware is not on point. In *United States v. Campbell,* 920 F.2d 793 (11th Cir.1991), the court reversed the district court's denial of Campbell's motion to suppress marijuana found in her pickup truck. The court held, *inter alia,* that the police lacked probable cause to arrest Campbell and search her truck because the information upon which the police's conduct was based was supplied by an informant found to be unreliable and lacked corroboration. *Id.* at 797.

36. However, unlike the informant in *Campbell,* Pedrolini was principally involved in the same criminal activity as the party at issue. Pedrolini was hardly an anonymous tipster. He was Ware's co-defendant and supplied information to law enforcement *after* their arrest.

37. Just as inapplicable as *Campbell* is *Ortega v. Christian,* 85 F.3d 1521 (11th Cir. 1996). In *Ortega,* the court reversed the district court's order granting the defendant's motion for judgment on the pleadings on the plaintiff's claim of false arrest. *Id.* at 1525–26. The issue was whether the defendant-police officer had probable cause to arrest Ortega based on a confidential informant's identification of Ortega—who was later released in a case of mistaken identify—as someone who committed a robbery. *Id.* at 1524. The court held that the police officer lacked probable cause to arrest Ortega because the information supplied by the informant was insufficient under the totality of the circumstances. *Id.* at 1525.

38. One of the "essential" circumstances that prevented the informant's information from supporting probable cause to arrest was a lack of evidence that the informant actually knew Ortega. 85 F.3d at 1525. Further, there was a lack of evidence prior to Ortega's arrest that corroborated the informant's identification of him. *Id.*

39. Unlike the informant in *Ortega,* Pedrolini was principally involved in the same criminal activity as the party at issue. Further, unlike the defendant-police officer in *Ortega,* Agent Hedges and law enforcement under his command easily possessed sufficient evidence to sustain an arrest. Finally, contrary to Ortega's case, Ware's case is certainly not one of mistaken identity. Therefore, the "totality of the circumstances" in *Ortega* are vastly different from the "totality of the circumstances" in this case.

40. Ware persists in arguing that any finding or presumption of probable cause was tainted because the information available to Agent Hedges, including Pedrolini's testimony in conjunction with the fingerprint report, was not sufficiently trustworthy or reliable for a cautious person to continue the prosecution of Ware. Quoting authority cited within *Owens v. City of Pensacola,* 355 So.2d 1266, 1267 (Fla. 1st DCA 1978), Ware contends that Agent Hedges, upon receiving the exculpatory fingerprint report, had a duty to further investigate after the report failed to independently verify Pedrolini's testimony.

41. Neither argument is well taken. The Court concludes that Pedrolini's testimony was sufficiently trustworthy and reliable to continue prosecuting Ware, with or without the fingerprint report. There was more than enough independent information for a cautious person to believe Pedrolini's implication of Ware. Pedrolini told Von Reese that he was coming to Florida to purchase cocaine with someone else's money. Pedrolini exchanged that money for cocaine from Vernoy. Immediately thereafter, Pedrolini telephoned Ware and told him to be ready to leave Florida less than twenty-four (24) hours after their arrival. Law enforcement witnessed Ware leaning into the open hatch area of Pedrolini's Corvette for a period of time well in excess of that needed to verify the cocaine's existence. Finally, once stopped, Ware exhibited consciousness of guilt by ly-

ing to the police about hitchhiking and visiting his sister.

42. While it is true that the above facts, standing alone, would have been insufficient to negate all reasonable hypotheses of Ware's innocence, their combination with Pedrolini's testimony makes for a criminal case legally and ethically capable of prosecution. Therefore, contrary to Ware's assertion, the first criminal trial commenced on more much more than "facts susceptible to being explained as innocent conduct." *Lindeman v. C.J. Stoll, Inc.*, 490 So.2d 101, 103 (Fla. 2d DCA), *rev. denied*, 500 So.2d 543 (Fla.1986). As such, there was probable cause to start the first criminal trial.

### (iv) Commencement of Second Criminal Trial.

43. Just as there was probable cause at the start of the first criminal trial, there was probable cause at the start of the second criminal trial.

44. As the Court has discussed *supra*, the fact that Ware's original conviction was vacated because of a *Brady* violation does not affect the presumptive existence of probable cause. *See Padrevita v. City of Lake Worth*, 367 So.2d 739, 741 (Fla. 4th DCA), *cert. denied*, 379 So.2d 203 (Fla.1979). Further, the Court has already concluded that the Government's *Brady* violation, without more, is not evidence that fraud, perjury, or other corrupt means were employed to procure the original conviction. Therefore, the presumption of probable cause remained unrebutted throughout the second trial.

45. The Court reincorporates its conclusions of law with regard to the first trial. The Court adds that there was more than enough independent information for a cautious person to believe Pedrolini's implication of Ware, *Conclusion of Law ¶ 41*, despite the fact that Ware's pre-arrest statements about hitchhiking and visiting his sister were suppressed before the start of the second criminal trial, and therefore effectively removed from the probable cause analysis at this stage.

46. Although Ware's initial conviction gives rise to a presumption of probable cause, Ware's ultimate acquittal does not rebut or negate the existence of probable cause. *Gallucci v. Milavic*, 100 So.2d 375, 377 (Fla.1958); *Phelan v. City of Coral*, 415 So.2d 1292 (Fla. 3d DCA 1982).

47. Contrary to the Government's unsupported view of Florida law, Judge Merryday's denial of Ware's motion for judgment of acquittal at the close of the Government's case cannot be construed as a finding of probable cause. *Pinkerton v. Edwards*, 425 So.2d 147, 150 (Fla. 1st DCA 1983). Pinkerton had been charged, through information, with battery on a law enforcement officer. *Id.* at 148. The case went to trial. *Id.* After the prosecution rested, Pinkerton moved for a judgment of acquittal under Fla.R.Crim.P. 3.380, which was denied by the court. *Id.* After her acquittal, Pinkerton sued the law enforcement officer for malicious prosecution, among other claims. *Id.* The trial court granted the law enforcement officer's motion for summary judgment on the grounds that the criminal court's denial of the motion for judgment of acquittal constituted a finding of probable cause. *Id.*

48. The *Pinkerton* court reversed, concluding that "a motion for a judgment of acquittal does not present the issue of lack of probable cause." *Id.* at 150. The court reasoned that, unlike a magistrate judge's objective and impartial review of the evidence in an adversarial probable cause hearing, the criminal trial judge must view the evidence in a light most favorable to the prosecution. *Id.*

49. Apart from minor differences in the language of the rules, a motion for judgment of acquittal under the Federal Rules employs the same standard as a motion for judgment of acquittal under the Florida Rules. *Compare Fed.R.Crim.P. 29(a)* (judgment of acquittal must be entered "if the evidence is insufficient to sustain a conviction") *with Fla. R.Crim.P. 3.380(a)* (judgment of acquittal may be entered "if the evidence is insufficient to sustain a conviction"). Therefore,

*Pinkerton* renders Judge Merryday's ruling irrelevant to the probable cause inquiry.

50. Nevertheless, there was probable cause to start the second criminal trial in light of the unrebutted presumption derived from sources other than the denial of the motion for judgment of acquittal.

### E. Malice.

■ 51. Ware failed to prove the fifth element, that "there was malice on the part of the present defendant." *Alamo,* 632 So.2d at 1355.

■ 52. While malice may be inferred from want of probable cause, want of probable cause may not be inferred from malice. *Gallucci v. Milavic,* 100 So.2d 375, 378 (Fla. · 1958). Thus, even if Ware had proven the element of malice, it would have had no bearing on his failure to prove lack of probable cause. Nevertheless, the Court will analyze the element of malice—along with the other elements of malicious prosecution, the affirmative defense of guilt-in-fact, and subject matter jurisdiction—irrespective of its conclusions with regard to the element of lack of probable cause, except to the extent that malice can be inferred from lack of probable cause. This approach to the analysis is consistent with the Court's communication to the parties at trial that it would render alternative findings.

53. "Malice is not only an essential element of malicious prosecution but it is the gist of this cause of action. Such malice may be one of two kinds: (a) actual or subjective malice, sometimes called 'malice in fact,' which results in intentional wrong; and (b) 'legal malice,' which may be inferred from circumstances such as the want of probable cause, even though no actual malevolence or corrupt design is shown." *Wilson v. O'Neal,* 118 So.2d 101, 105 (Fla. 1st DCA) (adopting the "time-honored requirement" of malice and rejecting as insufficient a showing of "careless performance of duty and failure to make due inquiry"), *cert. dismissed,* 122 So.2d 403 (Fla.1960), *cert. denied,* 365 U.S. 850, 81 S.Ct. 813, 5 L.Ed.2d 814 (1961).

54. In the present case, Ware does not contend that Agent Hedges acted with actual malice, i.e., "actual malevolence or corrupt design." *Wilson,* 118 So.2d at 105. Nor is there evidence of any actual malice on Agent Hedges' part. As such, Ware must show that Agent Hedges acted with legal malice. *E.g., Lee v. Geiger,* 419 So.2d 717, 719 (Fla. 1st DCA 1982) (reviewing evidence of legal malice presented at trial because the plaintiff did not contend that the defendant-detective "acted with ill motive or actual malice"), *rev. denied,* 429 So.2d 5 (Fla.1983).

55. In light of the Court's conclusion that probable cause existed at all stages of Ware's prosecution, legal malice cannot be inferred from lack of probable cause. However, lack of probable cause is not the only circumstance capable of supporting a finding of legal malice. Rather, "legal malice ... may be inferred from, among other things, ... gross negligence, or great indifference to persons, property, or the rights of others." *Alamo,* 632 So.2d at 1357.

56. The issue then becomes whether Agent Hedges acted with gross negligence, i.e., with great indifference to Ware's rights.

57. Ware contends that the continuation of Ware's prosecution in spite of Agent Hedges' failure to recognize the exculpatory nature of the FBI fingerprint report and to bring it to AUSA Moore's attention constitutes gross negligence. It is the Government's position that Agent Hedges' actions were consistent with FBI policy and, therefore, not grossly negligent.

58. The Court concludes that Agent Hedges did not act with gross negligence or with great indifference to Ware's rights. It is true that investigators, such as Agent Hedges, have a constitutional obligation to disclose exculpatory and impeachment evidence, such as the FBI fingerprint report, to the prosecutor. *See McMillian v. Johnson,* 88 F.3d 1554, 1567 n. 12 (11th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 2514, 138 L.Ed.2d 1016 (1997). It is then the prosecutor's constitutional obligation to disclose such evidence to the defense. *Brady,* 373 U.S. at 87, 83 S.Ct. at 1196–97.

59. Agent Hedges satisfied his constitutional obligations to Ware by filing the fingerprint report in the investigation file, to which AUSA Moore had ready access. Agent Hedges did not hide the evidence from the prosecutor. Rather, he complied with the standard practice of the FBI at the time, which was to place documentary evidence in the investigation file.

60. While this standard of practice was in line with the FBI's constitutional duties regarding exculpatory evidence, it does not necessarily follow that such a standard was wise or even ethical. Indeed, subsequent to the relevant events in this case, the FBI has taken steps to raise this minimal standard by training FBI agents about the "necessity to highlight [exculpatory evidence] for ... the Assistant U.S. Attorney." *FBI Director (and former U.S. District Judge) Louis Freeh's Speech at the Federal Judges Association Annual Meeting, May 13, 1997.*

61. It is unknown to this Court whether AUSA Moore actually knew of the fingerprint report's existence prior to Ware's first criminal trial. At the very least, he had constitutional and tactical obligations to thoroughly review the investigation file prior to trial. Nevertheless, there can be little doubt that the FBI's new emphasis on highlighting exculpatory evidence is more effective than the standard followed by Agent Hedges in this case. The new standard ensures that prosecutors are actually aware of any arguable exculpatory evidence prior to trial rather than it remain buried in a thick investigation file. The risk of mistrials is minimized as prosecutors are better assisted to meet their constitutional obligations of disclosure.

62. Although the benefits of the FBI's new standard are many and obvious, the arguable inadequacies in the FBI's old standard of practice do not support a finding that Agent Hedges acted with gross negligence in following it. As discussed *supra* ¶ 59, there is no showing that Agent Hedges acted unconstitutionally. On the contrary, as dictated by the Court of Appeals, *see Procedural History* ¶ 12, the applicable law was not clearly established at the time of Ware's prosecution that the fingerprint report was even exculpatory. This suggests that Agent Hedges may not have been grossly negligent even if he were to have accidentally lost the fingerprint report as opposed to placing it into the investigation file.

63. At most, Agent Hedges acted negligently by failing to personally deliver and highlight the fingerprint report to AUSA Moore. Negligence, however, is not sufficient to support an inference of malice; it has already been established by this Court that "neither Florida nor the common law imposes liability ... for mere negligence in the continuing investigation of a criminal prosecution of a crime which has actually occurred." *Ware v. United States,* 838 F.Supp. 1561, 1563 (M.D.Fla. Nov.19, 1993) (Docket No. 89).

64. To the extent that Ware argues that Agent Hedges acted with gross negligence by failing to further investigate Pedrolini's credibility in light of the fingerprint report, the Court fails to so find. First and foremost, the Court stands by its conclusion that Pedrolini's statements were sufficiently corroborated by evidence other than the fingerprint report, which the Court finds to be not inconsistent with Pedrolini's testimony. *Findings of Fact* ¶ 83; *Conclusion of Law* ¶ 41.

65. Furthermore, the mere fact that law enforcement could have investigated more effectively does not support a finding of legal malice. In *Lee v. Geiger,* 419 So.2d 717 (Fla. 1st DCA 1982), *rev. denied,* 429 So.2d 5 (Fla.1983), the plaintiff was arrested by the defendant-detective for burglary and attempted sexual battery. *Id.* at 718. After the alleged victim made an "absolute identification" of the plaintiff, the defendant-detective arrested him. *Id.* at 719. After the prosecution dropped the charges upon the victim's refusal to testify, the plaintiff sued the detective for malicious prosecution on the ground of failure to investigate his alibi. *Id.* At trial, the jury found for the plaintiff. *Id.* at 718.

66. The appellate court reversed, holding that "at most [the defendant-detective] was guilty of poor judgment in conducting his investigation and ... such action does not constitute legal malice." *Lee*, 419 So.2d at 719. Responding to the plaintiff's claim that the defendant-detective should have investigated his 3:00 a.m. alibi for the 4:00 a.m. alleged assault, the court stated that it was "obvious ... that the investigation performed was not a textbook example of proper investigation of a crime. However, an imperfect criminal investigation is not a sufficient basis for a recovery in a malicious prosecution ... action." *Id.* It was sufficient for the defendant-detective to initiate prosecution based on statements from the alleged victim because "[i]n many, if not most, sexual battery or sexual assault cases the victim is the sole witness as to the identity of her attacker and as to the facts and circumstances of the assault." *Id.*

67. It can certainly be argued that both Agent Hedges and the detective in *Lee* performed "imperfect" investigations. More investigation into Pedrolini's credibility might have caused the prosecution enough hesitation in its reasonable doubt assessment to present Ware with an attractive plea bargain or even seek dismissal of the indictment, just as more investigation into the *Lee* plaintiff's alibi might have prevented his arrest.

68. However, it is not for this Court to second guess the level of investigation employed by Agent Hedges given the existence of probable cause at all stages of the prosecution. Any opinion by this Court similar to the opinion of the *Lee* court that the investigation and prosecution of Ware were not "textbook example[s]" or that Agent Hedges was "guilty of poor judgement" is insufficient to support a finding of malice.

69. Just as sexual battery cases often depend on the victim's testimony for successful prosecution, drug conspiracy cases often involve one co-conspirator testifying against

another. Therefore, in light of the foregoing reasons, Agent Hedges did not act with gross negligence by failing to further investigate Pedrolini's credibility.

70. Finally, there were no "other things," *Alamo*, 632 So.2d at 1357, with regard to Agent Hedges' acts and/or omissions that would support an inference of legal malice.

### F. Damages. [22]

71. Ware failed to prove the last element, that he "suffered damage as a result of the original proceeding." *Alamo*, 632 So.2d at 1355.

72. Obviously, Ware is not entitled to any damages because of his failure to prove lack of probable cause and malice. *E.g., Winn–Dixie Stores, Inc. v. Gazelle*, 523 So.2d 648 (Fla. 1st DCA 1988). The Court's conclusion with regard to damages is, therefore, an alternative one.

73. In his closing argument, Ware seeks an award of compensatory damages in the amount of $4,851,360.00 for non-economic losses and $300,000.00 in economic losses. (Docket No. 224, pp.77–78). . Ware does not request the Court to award punitive damages.

74. Under Florida law, assessing the amount of damages in an action for malicious prosecution is peculiarly within the province of the trier of fact. *Schlesser v. Levinson*, 406 So.2d 1265, 1266 (Fla. 4th DCA 1981) (affirming a malicious prosecution jury verdict of $2,500.00 in compensatory damages); *Adler v. Segal*, 108 So.2d 773, 775 (Fla. 3d DCA) (affirming a malicious prosecution jury verdict of $10,000.00 in compensatory damages and $5,000.00 in punitive damages), *cert. denied*, 113 So.2d 834 (Fla.1959).

75. It is basic hornbook law that, in an action for malicious prosecution, "the plaintiff may recover all damages that are the natural and probable consequences of the action complained of." *Florida Jur. 2d*, False Impris-

---

**22.** It should be noted that many of the conclusions of law under this section are actually findings of fact.

onment § 39 (1995). However, "[t]he damages must be certain and proximate and not uncertain, contingent or speculative." *Id.*

76. Ware failed to prove that he incurred any type of compensatory damages as a result of the Government's prosecution of him.

▮ 77. Reasonable out-of-pocket expenses are one type of compensatory damages available to a malicious prosecution plaintiff. *See Miami National Bank v. Nunez,* 541 So.2d 1259 (Fla. 3d DCA), *rev. denied,* 553 So.2d 1165 (Fla.1989). Ware, however, did not incur any discernable out-of-pocket expenses to defend himself against federal drug charges. At the time of his prosecution, Ware was found to lack the financial ability to retain a lawyer. The district court appointed him an attorney for the detention hearing and first and second criminal trials.

78. To the extent that this Court may award Ware reasonable attorneys' fees and costs incurred by him to bring this action for malicious prosecution, the Court elects not to award any. Ware's attorneys are retained under a pure contingency fee agreement. *Ware's Testimony.* No evidence was presented regarding costs. *Id.*

79. Ware failed to prove that he incurred any economic damages resulting from his incarceration of three (3) years and twenty-two (22) days. In 1985 and 1986, Ware's gross income from General Motors was in the mid $10,000.00 range. *Defendant's Exhibit Nos. 9A–9B.* However, since his voluntary resignation from GM in early 1987, Ware claims to have earned only a nominal amount of income while pursuing a career in music management up until the time of his arrest. *Ware's Testimony.* Presently, Ware is an actor in New York City earning approximately $37,000.00 per year. *Id.*

80. Thus, the gist of Ware's claim for economic damages is his delayed entry into the acting profession. He contends that, but for his incarceration, he would have been able to start his acting career at an earlier age. Based on retroactive projections of his current income, Ware opines that his incarceration prevented him from earning $300,-000.00.

81. The Court finds that this testimony lacks factual support and credibility. Ware himself concedes that the retroactive projections are "speculative." (Docket No. 224, p.78). Further, much of his testimony was highly conclusive rather than factual. For example, Ware opines that his age hampers his pursuit of acting roles and that youth is critical to the development of an African–American performer. *Ware's Testimony.* However, nothing in the record supports these bare conclusions. There was neither corroborative evidence nor any showing that Ware was qualified to render such opinions.

82. Without a factual basis to the contrary, the Court cannot help but render its own opinion that Ware's exposure to prison life actually enhanced his acting ability and career. Indeed, much of his testimony on direct examination appeared highly dramatic. It was only upon cross-examination that Ware's story was revealed to be superficially appealing at best.

83. Ware's testimony regarding economic damages lacked credibility in other ways. For instance, Ware was reluctant to admit that he did not begin to pursue an acting career until 1993. *Ware's Testimony.* He only made this concession upon effective cross examination by the Government using a prior, inconsistent, sworn statement. *Defendant's Exhibit No. 49A.*

▮ 84. Finally, Ware failed to prove that he incurred any legitimate, non-economic damages resulting from his incarceration. Ware seeks $4,851,360.00—roughly $3.00 per incarcerated minute—for injury to his reputation, shame, humiliation, mental anguish, and hurt feelings flowing from his prosecution. Ware correctly points out that, under Florida law, these are legitimate grounds for monetary relief in an action for malicious prosecution. *E.g., S.H. Kress & Co. v. Powell,* 132 Fla. 471, 180 So. 757 (1938).

85. However, the Court, sitting as the trier of fact, simply finds Ware's testimony

too incredible to support a finding of even $1.00 in non-economic damages. As noted above, Ware's damage testimony was superficial at best. The remaining portions of his testimony were so impeached, *see supra* *Findings of Fact* ¶ 80, that they inevitably tainted his testimony regarding damages.

■ 86. In Florida, the gravamen of an action for malicious prosecution is injury to character. *Cate v. Oldham*, 450 So.2d 224, 227 (Fla.1984). Ware's testimony about his good character was especially incredible. Ware testified that his good reputation in the Kalamazoo community was forever tarnished by the Government's prosecution of him and the ensuing incarceration. However, this testimony was completely impeached on cross-examination and through prior deposition testimony, *Defendant's Exhibit No. 48*, in that, at the time he left General Motors in early 1987, Ware knew of rumors that he sold cocaine at the plant. Further, there was credible, corroborative testimony from Dirk Bartley, Bradley Fields, and Pedrolini that Ware had a reputation as a cocaine dealer in Kalamazoo prior to this arrest.

87. Ware's rebuttal reputation witnesses, former girlfriend Charise Logan (live testimony), former GM co-worker Jeffrey Stephens (live testimony), college acquaintance Derrick Hollowell (deposition testimony, *Plaintiff's Exhibit Nos. 15A & 15B*), brother Ronald Ware (live testimony), former Club Soda co-worker Charles Horton (deposition testimony, *Plaintiff's Exhibit Nos. 16A & 16B*), former acquaintance Tracy Burton (deposition testimony, *Plaintiff's Exhibit Nos. 14A & 14B*), and Brenda Burgheis (prior testimony from the second criminal trial, *Plaintiff's Exhibit No. 13*), lack believability as compared to Ware's own admissions and the Government's reputation witnesses. Each of Ware's rebuttal witnesses did not know much about Ware's life, had reasons to lie for Ware, were proven to be liars in general, and/or gave hopelessly evasive testimony.

88. The Court is certain that Ware did not enjoy prison. However, his lawsuit appears to be more of an effort to avenge the Government rather than an honest attempt to make himself monetarily whole. *See Procedural History* ¶ 1 (original administrative prayer for relief of $50,000,000.00 sum certain); *Defendant's Exhibit No. 20* (Ware's letter to Judge Castagna from prison, where he states: "I'll sue you and everybody else responsible for the *pain* I've gone through.... Don't forget me Judge cause I'm not going to forget you. You or [AUSA] Dennis Moore.").

89. For the reasons stated above, the Court declines to award any damages to Ware and finds any evidence of injury to be incredible, uncertain, contingent, and/or speculative.

## II. *Affirmative Defense of Guilt–in–Fact.*

### A. *The Validity of the Affirmative Defense.*

90. Notwithstanding Ware's failure to prove three (3) of the six (6) essential elements of malicious prosecution, the Government proved the affirmative defense of guilt-in-fact.

■ 91. Because the parties agree that there are no reported Florida cases addressing the affirmative defense of guilt-in-fact, the Court is faced with the threshold issue of whether a federal district court applying Florida law in an action against the Government under the Federal Tort Claims Act may recognize this affirmative defense without violating the *Erie* [23] doctrine.

92. *Erie* and its progeny, of course, stand for the proposition that a federal district court, exercising diversity or supplemental jurisdiction, must apply the law of the state in which it sits. The *Erie* doctrine is based on notions of federalism and the goal of preventing forum shopping.

93. The Federal Tort Claims Act (FTCA) is the federal government's statutory waiver of sovereign immunity. *See United States v. Sherwood*, 312 U.S. 584, 586, 61 S.Ct. 767, 769, 85 L.Ed. 1058 (1941). As relevant to

**23.** *Erie Railroad v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

this case, the FTCA confers original and exclusive jurisdiction to federal district courts over civil actions for money damages against the United States. 28 U.S.C. § 1346(b). District courts are directed to apply "the law of the place where the act or omission occurred." *Id.*

94. Civil actions against the Government brought pursuant to 28 U.S.C. § 1346(b) do not implicate the same concerns of *Erie.* Because a FTCA plaintiff may not bring suit in any other forum but federal district court, there is no danger of forum shopping. Nor are federalism concerns implicated. States are not granted residual power under the Constitution to implement laws governing suits against the federal government. It is only by statute, rather than by constitutional mandate, that the federal government has decided that it may be sued as a private person would be under applicable state law.

95. The *Erie* issue facing this Court is different from the *Erie* issue presented in *Blackford v. Wal–Mart Stores, Inc.,* 17 F.3d 367 (11th Cir.1994). In *Blackford,* a customer sued Wal–Mart for malicious prosecution based on its initiation of criminal bad check proceedings which had been dismissed. *Id.* at 367–68. The district court had jurisdiction based on diversity and was to apply Georgia law. *Blackford v. Wal–Mart Stores, Inc.,* 912 F.Supp. 537, 540 n. 3 (S.D.Ga.1996). Discovery revealed proof of the customer's guilt, albeit after the conclusion of criminal proceedings. *Wal–Mart Stores, Inc. v. Blackford,* 264 Ga. 612, 449 S.E.2d 293, 294 (1994). After the district court denied Wal–Mart's request to introduce this post-trial evidence of guilt, the jury found for the customer and awarded damages. 17 F.3d at 368.

96. On appeal, the United States Court of Appeals for the Eleventh Circuit determined that the case involved "an unanswered question of Georgia law that is determinative of" the action for malicious prosecution. *Blackford,* 17 F.3d at 367. As such, they certified the following question to the Supreme Court of Georgia:

[W]hether, under Georgia law, in a suit alleging malicious prosecution of a criminal

bad check charge that was dismissed by the court without trial, evidence is admissible that tends to show the plaintiff was in fact guilty of the bad check offenses with which she was charged and, if guilt in fact is proved, is this a bar to plaintiff's suit?

*Id.* at 368. The Georgia Supreme Court subsequently answered the question in the affirmative, 449 S.E.2d at 295, the Eleventh Circuit reversed and remanded, 47 F.3d at 1119, and the district court granted Wal–Mart's motion for summary judgment, 912 F.Supp. at 544.

97. Just as the district court in *Blackford* faced an unanswered question of Georgia law, this Court faces an unanswered question of Florida law. In fact, both questions are essentially the same: whether guilt-in-fact is a viable affirmative defense to an action for malicious prosecution.

98. However, unlike the district court in *Blackford,* this Court is not sitting in diversity. Ware did not have the option of bringing suit in state court; this Court has original and exclusive jurisdiction over his FTCA action. As such, abstention from deciding the case is not appropriate. *See England v. Louisiana State Board of Medical Examiners,* 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964); *cf.* 28 U.S.C. § 1367(c). Nor is certification to the Supreme Court of Florida permissible. *Fla. Const.* art. V, § 3(b)(6) (granting jurisdiction to the Florida Supreme Court to review questions of law certified "by the Supreme Court of the United States or a United States Court of Appeals").

99. Because the *Erie* concerns implicated in an action based on diversity or supplemental jurisdiction are not presented in an action under the FTCA, 28 U.S.C. § 1346(b), this Court holds that it has the power to decide whether the affirmative defense of guilt-in-fact should be recognized in an action for malicious prosecution despite the absence of controlling precedent from the courts of Florida.

100. This Court will, therefore, recognize the affirmative defense of guilt-in-fact if it

appears that the Supreme Court of Florida or any other authoritative body in the state would do so if it were faced with the issue. *Cf. Commissioner v. Bosch's Estate*, 387 U.S. 456, 465, 87 S.Ct. 1776, 1782–83, 18 L.Ed.2d 886 (1967).

101. The Government urges the Court to validate the affirmative defense in light of "well settled" precedent from other jurisdictions such as Georgia and persuasive hornbook authors Prosser and Keeton. Ware contends that post-acquittal evidence of his guilt is simply irrelevant under Florida law and inconsistent with the jury's verdict in the second criminal trial.

 102. The Court holds that, in an action for malicious prosecution brought pursuant to the FTCA, 28 U.S.C. § 1346(b), where Florida law applies, the Government may assert the affirmative defense of guilt-in-fact. Furthermore, evidence that tends to show the plaintiff's actual guilt, including evidence acquired after a bona fide termination of the original proceeding in favor of the plaintiff, is admissible to prove this affirmative defense. On the other hand, evidence acquired after the termination of the original proceeding is not admissible to disprove the essential elements of the cause of action, i.e. lack of probable cause and malice.[24]

103. The Court is convinced that the Supreme Court of Florida would likely recognize this affirmative defense if faced with the issue today. As emphasized by the Supreme Court of Georgia, recognizing the affirmative defense "comports with the policy of the courts that malicious prosecution suits are disfavored and citizens are encouraged to bring to justice those who are apparently guilty." *Blackford*, 449 S.E.2d at 295. This policy is just as pervasive in Florida. *E.g., Wilson v. O'Neal*, 118 So.2d 101 (Fla. 1st DCA 1960). The *Blackford* court also noted that "[a] guilt in fact defense is recognized pervasively." *Id.*, 449 S.E.2d at 295 n. 4 (citations omitted).

 104. However, unlike the Supreme Court of Georgia's view of the defense, this Court does not believe that "evidence of guilt in fact of the accused is admissible as a defense to the damage element." *Blackford*, 449 S.E.2d at 295. Unlike Florida, Georgia defines the tort of malicious prosecution by statute, which provides that a "criminal prosecution which is carried on maliciously and without any probable cause and *which causes damage* to the person prosecuted shall give him a cause of action." O.C.G.A. § 51–7–40 (emphasis added). It is likely, then, that the *Blackford* court reconciled its holding with the plain language of this Georgia statute, which is silent on the availability and application of affirmative defenses.

 105. Without a similar restriction, this Court believes that it is more logical to view guilt-in-fact as an affirmative defense, that is, a complete bar to an action for malicious prosecution even if the plaintiff proves his or her *prima facie* case, including damages. In Florida, the gravamen of an action for malicious prosecution is injury to character. *Cate v. Oldham*, 450 So.2d 224 (Fla. 1984). Although in this case the Court has found that Ware's character was already impugned prior to the prosecution, it is conceivable that a malicious prosecution plaintiff could suffer injury to his good character as a result of unjustified prosecution, yet still be proven guilty upon the discovery of inculpatory evidence (previously unknown by both the malicious prosecution defendant and the relevant character community) well after the conclusion of the original proceeding. For this reason, guilt-in-fact should not be viewed as simply a way to negate the essential element of damages.

 106. Where, as here, the Government seeks to prove that the plaintiff is guilty of federal offenses, federal law applies as to the elements and application of such offenses. The Government must prove all

---

**24.** The Court recognizes that, in jury trials, this admissibility distinction may cause undue confusion and other types of danger. *See* Fed.R.Evid. 403. However, in the present case, these concerns are not implicated, in that the Court's holding is limited to actions brought pursuant to the FTCA, which does not provide for jury trials.

the elements of each offense by a preponderance of the evidence.

 107. The Government is not precluded from proving Ware's guilt-in-fact by a preponderance of evidence merely because a jury acquitted him of both criminal offenses. It is fundamental that "acquittal on criminal charges does not prove that the defendant is innocent; it merely proves the existence of a reasonable doubt as to his guilt." *United States v. Watts*, —— U.S. ——, ——, 117 S.Ct. 633, 637, 136 L.Ed.2d 554 (1997) (citations omitted). Furthermore, an "acquittal is not a finding of any fact. An acquittal can only be an acknowledgment that the government failed to prove an essential element of the offense beyond a reasonable doubt." *Id.* As such, "an acquittal in a criminal case does not preclude the Government from relitigating an issue when it is presented in a subsequent action governed by a lower standard of proof," such as the preponderance of evidence. *Id.*

### B. Conspiracy to Possess with Intent to Distribute.

 108. The Government proved, by a preponderance of the evidence, that Ware was actually guilty of the offense charged in count one (1) of the indictment, conspiracy to possess with intent to distribute five (500) grams or more of cocaine, in violation of 21 U.S.C. § 846.

109. "To prove conspiracy to possess cocaine with intent to distribute, the government must establish three elements: (1) that a conspiracy to possess [and distribute] cocaine existed; (2) that [Ware] knew of the goal of the conspiracy; and (3) that [Ware], with knowledge, voluntarily joined it." *United States v. Mejia*, 97 F.3d 1391, 1392 (11th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1016, 136 L.Ed.2d 893 (1997).

110. The Government proved the first element, that a conspiracy to possess and distribute cocaine existed. According to Von Reese, Pedrolini agreed to exchange someone else's money for a significant quantity of cocaine that would be transported back to Michigan for distribution. After exchanging the cash for cocaine, Pedrolini told Vernoy that he and a "partner" would be immediately leaving Florida for Michigan and that his partner would be waiting out on a road near Interstate 75 as a "hitchhiker." Prior to his arrest, Ware told Officer Umbaugh that he met Pedrolini while hitchhiking.

111. The Government proved the second element, that Ware knew of the goal of the conspiracy. It is true that "close association with a mere co-conspirator or mere presence at the scene of the crime is insufficient evidence of knowing participation in a conspiracy." *United States v. Andrews*, 953 F.2d 1312, 1318 (11th Cir.), *cert. denied*, 505 U.S. 1227, 112 S.Ct. 3048, 120 L.Ed.2d 915 (1992). However, Ware was more than just closely associated with Pedrolini and more than just present in a two-seat Corvette with four (4) kilograms of cocaine within feet of his seat. Ware had previously purchased cocaine from Pedrolini. In April, 1989, Ware told Pedrolini that he wanted to purchase a significant quantity of cocaine. Ware promised Bradley Fields that he would have more cocaine after returning from Florida. Ware counted the money before Pedrolini took it to Von Reese. Leaning over the hatch of the Corvette and looking into the brown bag that contained the cocaine, Ware asked Pedrolini if "it's there." The fact that Ware did not test the cocaine or otherwise break the sealed containers is not significant. *United States v. Cruz*, 106 F.3d 1553, 1555 (11th Cir.1997) (affirming the conspiracy conviction of a defendant who declined to inspect a van for 30 kilograms of cocaine). Further, Ware exhibited consciousness of guilt through his pre-arrest lies to Officer Umbaugh.

112. The Government proved the third element, that Ware voluntarily joined the conspiracy. Ware agreed to supply the money for the cocaine deal. Ware further agreed to pay Pedrolini to arrange for and acquire cocaine from Von Reese. Pedrolini and Ware agreed to drive Pedrolini's car to Florida. They both knew that the trip would be brief, as evidenced by the trivial amount of

luggage they brought. Ware told Dirk Bartley and Bradley Fields about his trip to Florida and its unlawful purpose. Finally, Ware performed numerous overt acts in furtherance of the conspiracy, including counting the bundles of cash prior to handing the money over to Pedrolini.

113. For these and other reasons, it is more likely than not that the plaintiff FRANK ANDRE WARE conspired to possess with intent to distribute cocaine in April, 1989, in violation of 21 U.S.C. § 846.

### C. Possession with Intent to Distribute Cocaine.

■ 114. The Government also proved, by a preponderance of the evidence, that Ware was actually guilty of the offense charged in count two (2) of the indictment, possession with intent to distribute five (500) grams or more of cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

115. To prove possession with intent to distribute cocaine, "the government must prove that [Ware] (1) knowingly (2) possessed cocaine (3) with intent to distribute it." *United States v. Harris,* 20 F.3d 445, 453 (11th Cir.1994). "The government may prove each of these elements with direct or circumstantial evidence." *Id.*

116. The Government proved the first element, that Ware had knowledge of the cocaine. Pedrolini acted as Ware's agent by acquiring cocaine in exchange for cash that Ware had provided. Pedrolini met Ware after the exchange as planned. Ware responded with understanding when Pedrolini told him "there it is." These and other circumstances surrounding Ware's presence in Pedrolini's two-seat Corvette were "so obvious that knowledge … can fairly be attributed" to Ware. *Andrews,* 953 F.2d at 1318.

117. The Government proved the second element, that Ware possessed cocaine. Constructive possession is defined as "the knowing exercise of or the knowing power or right to exercise dominion and control over the substance." *United States v. Poole,* 878 F.2d 1389, 1392 (11th Cir.1989). "Constructive

possession need not be exclusive," *id.,* and "[e]ven if … the other conspirator[ ] exercised actual control over the drugs," Ware may be guilty for aiding and abetting the possession under 18 U.S.C. § 2. *United States v. Bain,* 736 F.2d 1480, 1486 (11th Cir.), *cert. denied,* 469 U.S. 937, 105 S.Ct. 340, 83 L.Ed.2d 275 (1984). By the very terms of Ware's and Pedrolini's unlawful agreement, the four (4) kilograms of cocaine belonged to Ware. Pedrolini was merely his agent. Thus, Ware at least had the power to exercise dominion and control over the cocaine. In addition, Ware aided and abetted Pedrolini's possession of cocaine by supplying the $54,980.00 in cash for its purchase.

118. The Government proved the third element, that Ware had the intent to distribute the cocaine. "Intent to distribute a controlled substance under 21 U.S.C. § 841 may be inferred solely from possession of a large amount of the substance." *United States v. Grayson,* 625 F.2d 66, 66 (5th Cir.1980) (Hatchett, J.). Ware possessed four (4) kilograms of cocaine, well above the amount sufficient to support a finding of intent to distribute. *United States v. Mather,* 465 F.2d 1035 (5th Cir.) (possession of 197.75 grams of cocaine, without more, is sufficient to support an inference that distribution was intended), *cert. denied,* 409 U.S. 1085, 93 S.Ct. 685, 34 L.Ed.2d 672 (1972). Additionally, Ware expressed his intent to distribute the cocaine he was to purchase in Florida to Bradley Fields prior to leaving Michigan.

119. For these and other reasons, it is more likely than not that the plaintiff FRANK ANDRE WARE possessed with intent to distribute cocaine on April 24, 1989, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

### III. Exhaustion of Administrative Remedies.

■ 120. On or about the fourth day of trial, the Government filed, in open court, a motion to dismiss for lack of subject matter jurisdiction (Docket No. 195; reproduced verbatim in closing argument, Docket No.

226). The Court reserved ruling so that Ware could respond (Docket No. 222).

121. It is the Government's position that Ware failed to exhaust his administrative remedies pursuant to the FTCA, 28 U.S.C. § 2675(a). Section 2675(a) provides:

> An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail.

*Id.* "Section 2675(a) is satisfied if the claimant (1) gave the appropriate agency written notice of the tort claim to enable the agency to investigate; and (2) stated a sum certain as to the value of the claim." *Orlando Helicopter Airways v. United States,* 75 F.3d 622, 625 (11th Cir.1996) (citations omitted).

122. Specifically, the Government argues that Ware failed to submit an administrative claim to the FBI for malicious continuation of prosecution. It contends that Ware's administrative claim to the FBI dated June 13, 1992 (*Plaintiff's Exhibit No. 5*, relevant portions of which are recited *supra, Procedural History* at ¶ 1) failed to put the FBI on appropriate notice.

123. Ware responds that his June 13 administrative claim satisfies the notice standard under the law of this circuit. He labels the Government's mid-trial motion a "frivolous and bothersome nuisance" and summarily requests attorney fee sanctions under Fed. R.Civ.P. 11.

124. The Court agrees with Ware that the Government's mid-trial motion is not well taken, but for different reasons. Contrary to Ware's view, the legal issues raised by the Government are sufficiently "warranted by existing law" to avoid Rule 11 sanctions. However, it is because these legal issues were raised so late in the game that they appear disingenuous.

125. When this case was at the motion to dismiss stage, the Government successfully argued that Ware failed to exhaust his administrative remedies with regard to his claim for negligence. *Ware v. United States,* 838 F.Supp. 1561, 1563 (M.D.Fla.1993), discussed *supra, Procedural History* ¶ 7. The Government advanced other grounds for dismissal of the claim for malicious prosecution, which were obviously rejected. *Procedural History* ¶ 9. It is at this stage that the Government could, and should, have raised its exhaustion argument with regard to malicious prosecution. While waiting until the fourth day of trial may not constitute a waiver—given the notion that the claims procedure under section 2675(a) is jurisdictional and cannot be waived by the parties [25] — certainly does not promote the orderly administration of administrative claims. *See McNeil v. United States,* 508 U.S. 106, 112, 113 S.Ct. 1980, 1983–84, 124 L.Ed.2d 21 (1993).

126. Notwithstanding the untimeliness of the Government's jurisdictional argument, the Court concludes that Ware satisfied the claims procedure under the FTCA, 28 U.S.C. § 2675(a).

127. It is undisputed that Ware contacted the "appropriate agency," the FBI, and "stated a sum certain," $50,000,000.00.

128. As to the disputed issue of whether Ware gave the FBI sufficient notice of his claim for malicious continuation of prosecution, the Court finds in Ware's favor. The facts recited in Ware's three (3) page administrative claim are the exact same facts on which Ware bases his claim for malicious continuation of prosecution. Although Ware did not specifically refer to this tort by name,

---

25. *Bush v. United States,* 703 F.2d 491, 494 (11th Cir.1983); *Rise v. United States,* 630 F.2d 1068, 1071 (5th Cir.1980).

it is readily apparent to the reader that Ware sought damages for Agent Hedge's investigatory acts and omissions. In fact, Ware stated that Agent Hedges caused him to be "wrongfully convicted." Furthermore, Ware characterized Agent Hedge's conduct as "intentional[ ], purposeful[ ], and vindictive[ ]," which closely resembles an averment of malice, an essential element of malicious prosecution. Therefore, the FBI was clearly provided with "sufficient information to enable the government to investigate the tort claim." *Orlando Helicopter,* 75 F.3d at 625.

129. The Government relies on two (2) Eleventh Circuit cases, *Orlando Helicopter, supra,* and *Bush v. United States,* 703 F.2d 491 (11th Cir.1983), where the court found that the respective claimants failed to exhaust their administrative remedies under section 2675(a). However, Ware's administrative claim is materially distinguishable from the insufficient administrative claims in those cases.

130. The administrative claim in *Orlando Helicopter* failed to indicate misconduct on the part of anyone within the agency to whom the claim was sent. 75 F.3d at 626. The only misconduct alleged in the claim was that of a former employee of the claimant. *Id.* In contrast, Ware's administrative claim unambiguously alleges misconduct on the part of Special FBI Agent Hedges. Ware even points out, in factual detail, Agent Hedges' receipt of the fingerprint report prior to his first criminal trial and his failure to turn it over to the U.S. Attorney's Office.

131. Also in contrast to the administrative claim for malicious prosecution in the present case, the administrative claim in *Bush* contained no allegation of facts upon which the claim for lack of informed consent to operate could be based, i.e., that the Veterans Administration (VA) doctors failed to disclose the risks involved in the medical procedure. 703 F.2d at 495.

132. Rather, Ware's administrative claim is more akin to the administrative claim in

*Bush* that was deemed sufficient to put the government on notice of a claim for negligent post-operative care. 703 F.2d at 494.[26] Just as the *Bush* administrative claim (including documents incorporated by reference) suggested that the VA doctors should have reoperated on the claimant's deceased spouse sooner than they did, *id.,* Ware's administrative claim expressly states that Agent Hedges' mishandling of the fingerprint report proximate caused his wrongful conviction.

133. The Government points out Ware's administrative allegation of "false imprisonment" and argues that it necessarily prevents the FBI from being sufficiently notified of a claim for malicious prosecution in light of the differences between the two (2) torts under Florida law, *see Maybin v. Thompson,* 606 So.2d 1240, 1241 (Fla. 2d DCA 1992).

134. This argument fails. Regardless of the legal distinctions between a theory of liability listed in an administrative claim and an unlisted one, the issue is whether both actions "are based on the same injury in fact." *Brown v. United States,* 838 F.2d 1157, 1161 (11th Cir.1988) (concluding that a claimant had exhausted her administrative remedy for wrongful death, which was not specifically mentioned in her administrative claim, in light of the claimant's administrative allegation of malpractice). If so, then the Government is sufficiently notified of the unlisted theory of liability. *See Free v. United States,* 885 F.2d 840, 843 (11th Cir.1989).

135. Ware sought compensation for all injuries flowing from his incarceration, i.e., "mental anguish, psychological trauma, . . . humiliating and degrading loss of reputation, and loss of life's pleasures." The clear import of this administrative prayer is that Ware's alleged injuries arose out of the same set of facts, whether they be caused by false imprisonment or malicious prosecution.

136. Therefore, Ware's "labeling is not dispositive," *Orlando Helicopter,* 75 F.3d at 625, and the FBI received sufficient notice

---

**26.** The Government conveniently omitted any discussion of this sufficient administrative claim

from its memorandum of law.

from the June 13, 1992, administrative claim to investigate the Government's potential liability for malicious prosecution and act accordingly.

### IV. Other Pending Matters and Conclusion.

137. At the close of Ware's case-in-chief, the Government moved for judgment as a matter of law for Ware's failure to prove absence of probable cause and asked this Court to make partial findings of fact and conclusions of law under Fed.R.Civ.P. 52(c). The Court effectively **denied** that motion by "declin[ing] to render any judgment until the close of all the evidence," Rule 52(c).

138. At trial, the Court instructed the parties to reassert all unresolved objections in writing along with their closing arguments or they will be deemed waived. All objections not properly presented are, therefore, **overruled** as waived. All properly preserved motions, objections, or issues not discussed in this Order are **denied, overruled,** or **rejected** as without merit and unworthy of discussion.

139. In conclusion, Ware failed to prove three (3) of the six (6) essential elements of malicious prosecution. The Government proved the affirmative defense of guilt-in-fact, but not its legal argument regarding lack of subject matter jurisdiction.

140. In light of the outcome of this case, the Court remains puzzled as to FRANK ANDRE WARE's true motivation behind this action, for "a criminal fortunate enough to escape conviction should rest content with his good luck and not belabor one who suspected his guilt and acted accordingly." 52 *Am.Jur.2d Malicious Prosecution* § 76 (1970) (footnotes omitted). Accordingly, it is

**ORDERED** that:

(1) Defendant's Objections and Cross–Designations with Respect to Plaintiff's Designation of Deposition Testimony to be Offered from Clifford Hedges Deposition (Docket No. 174) be **OVERRULED;**

(2) Defendant's Objection to Plaintiff's Proposed Itemization of Damages as Con-tained within Plaintiff's Amendment to Joint Pretrial Stipulation (Docket No. 180) be **OVERRULED;**

(3) Plaintiff's Motion in Limine (Docket No. 181) be **GRANTED IN PART** and **DENIED IN PART,** as provided herein;

(4) Any and all unresolved objections contained within Defendant's Brief Concerning Objections to Deposition Transcripts Received in Evidence at Trial (Docket No. 225) be **OVERRULED;**

(5) Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction (Docket No. 195) be **DENIED,** as provided herein;

(6) Plaintiff's one sentence request for attorney fee sanctions as contained within his response to Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction (Docket No. 222) be **DENIED;**

(7) Defendant's Motion for Dismissal of Plaintiff's Claim and Judgment on Partial Findings Pursuant to Fed.R.Civ.P. 52(c) (Docket No. 196) be **DENIED;**

(8) Plaintiff's claim for money damages under the FTCA be **DENIED;** and

(9) The Clerk of the Court be **DIRECTED** to enter final judgement in favor of the last remaining Defendant, UNITED STATES OF AMERICA.